# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

|  |  |  |
|---|---|---|
| Craig Nelsen | | ) |
| | | ) |
| | | ) |
| | | ) |
| | Plaintiff, | ) |
| | | ) |
| | vs. | ) |
| | | ) |
| Southern Poverty Law Center | | ) |
| Stephen Piggot | | ) |
| Richard Cohen | | ) |
| Morris Dees | | ) |
| Heidi Beirich | | ) |
| | | ) |
| | | ) |
| | | ) |
| | Defendant . | ) |
| | | ) |

√ **JURY TRIAL REQUESTED**

## Table of Contents

**COMPLAINT**..........................................................................................................................3

**NATURE OF THE CAUSE**..................................................................................................3

**PARTIES**...............................................................................................................................3

   Plaintiff (Nelsen)...................................................................................................................3
      *For an immigration time-out*.........................................................................................*3*
      *Baltimore panhandlers*..................................................................................................*7*
   Defendant (SPLC)...............................................................................................................10
      *Not your father's non-profit tax-exempt civil rights group*.........................................*10*

**JURISDICTION AND VENUE**...........................................................................................**20**

**STATEMENT OF FACTS**..................................................................................................**21**

      *Robinson Jeffers Boxing Club*......................................................................................*21*
      *Lexington, Missouri* ......................................................................................................*24*
      *The SPLC enters the picture*.........................................................................................*26*
      *Ryan Wilson*...................................................................................................................*31*
      *Throwing in the towel*....................................................................................................*33*

**COUNT I**..............................................................................................................................**34**

   Defamation. Defendant falsely stated Plaintiff was not convincing anyone that the club was open to all races.
...............................................................................................................................................34

**COUNT II**.............................................................................................................................**38**

   Defamation by implication. Defendant falsely implied Plaintiff was opening a whites-only club..................38

**COUNT III**...........................................................................................................................**43**

   Defamation by endorsement. Defendant endorsed the false view of Plaintiff as resembling a neo-Nazi attempting to start a whites-only colony in North Dakota............................................................................43

**COUNT IV**............................................................................................................................**46**

   Defamation. Defendant falsely stated Plaintiff is 'anti-immigrant'.................................................46

**COUNT V**.............................................................................................................................**51**

   Defamation. Defendant falsely claims Plaintiff Nelsen's organization put up racist billboards......................51

**COUNT VI**............................................................................................................................**55**

   Malicious intent. Defendant unjustly defamed Plaintiff with the intent to completely destroy his effort.......55

**DEMAND**..............................................................................................................................**59**

**CERTIFICATION AND CLOSING** ...................................................................................**61**

# COMPLAINT

Plaintiff pleads *pro se:*

# NATURE OF THE CAUSE

This is an action for defamation in accordance with MO Rev Stat § 509.210 (2017) arising out of the Defendant's unauthorized publication of defamatory statements as defined in 28 USC § 4101(1) on a website owned and operated by Defendant and published in Missouri. As detailed herein, Plaintiff is entitled to compensatory and punitive damages as a result of Defendant's actions. All events giving rise to Plaintiff's cause of action occurred in Missouri, such that Missouri substantive law applies to Plaintiff's claims. Plaintiff requests a jury decide these claims.

# PARTIES

**Plaintiff (Nelsen)**

Plaintiff **Craig Nelsen** is the founder of the Robinson Jeffers Boxing Club and owner of robinsonjeffersboxingclub.com and is a natural person and private citizen residing at the time of the causes of action described herein in Lexington, Missouri.

*For an immigration time-out*

1.  Plaintiff Nelsen returned to the United States in 1997 after two years living in China. Specifically, he returned to New York City, from which he had been absent six years. As he settled back into life in the United States, he was struck by the number of Asians he saw on the streets of Manhattan. There seemed to be so many more than there had been just six years earlier. He wondered whether there had been such a noticeable change in terms of numbers in so short a time period or whether, having just returned from an extended period living in Asia,

Case 4:18-cv-00895-RK   Document 6   Filed 11/27/18   Page 3 of 62

he was just more Asian-aware.

2.      His curiosity piqued, Nelsen conducted research and learned that US immigration policy is
        fueling explosive US population growth. Having been so recently in overcrowded, polluted
        China, this break-neck population growth concerned him deeply. But, even more troubling to
        him, there was almost no public discussion of what seemed to him to be a reckless policy that
        was radically remaking the country in completely unpredictable ways—a policy running on
        autopilot with no kill switch. Particularly disturbing, there seemed to be an absolute taboo
        against even the mildest criticism of the current policy. Any expression of reservation
        whatsoever regarding current policy meant immediate denunciation as a xenophobic racist. This
        had the practical effect of acting as a blanket suppression of certain political speech.

3.      Believing such suppression of political speech to be contrary to the principles of the Founders,
        and detrimental to the political health of the nation, Nelsen made the decision to sell off his
        share of several restaurants he owned with his brother in Manhattan and use the money to form
        a group to erect billboards in New York and elsewhere to inform his fellow citizens about basic
        immigration facts. The goal was to generate public debate on this important issue free from the
        vicious name-calling that attended even the mildest criticism of what was, after all, simply a
        public policy issue. He called the group ProjectUSA and posted a mission statement announcing
        that the goal of ProjectUSA was to drag the immigration issue into the middle of public debate
        where it belonged and delink it from race so that people could debate it in a manner suitable to a
        mature democracy.

4.      All ProjectUSA billboard messages were based on government data or polling data from
        reputable firms. Nevertheless, the debate the billboards generated did not seem the product of a

sober, thoughtful citizenry. Among other excesses: Congressman Joe Crowley, Nelsen's representative in Congress, called the billboards "loathsome"; a group of rabbis protested in front of a billboard in Queens; *The Daily Show's* Jon Stewart ridiculed Nelsen on Comedy Central and used a photo of him with a Hitler mustache superimposed; TV crews camped outside the homes and businesses of family members; politicians held press conferences denouncing the "hate" the billboards spread; the New York City Council voted 43-2 to condemn ProjectUSA and, at a news conference after the vote, Nelsen was compared to a self-described neo-Nazi who had shot up a Jewish daycare center in Los Angeles and murdered an Asian postal worker the day before; New York State Assemblyman Dov Hikind, writing in the *Jewish Forward*, inveighed against "the putrid stench of Nelsen's racism"; billboard companies—after threats from city officials—broke their contracts and took down ProjectUSA billboards.[1]

5.      Defendant SPLC joined in the public hysteria, denouncing Nelsen and ProjectUSA and implying in its "Intelligence Report" that the billboards were "racist". Most damaging and outrageously unfairly, the SPLC used its well-honed skills at character assassination to link ProjectUSA and Nelsen to "Nazi atrocities".

6.      Being publicly slammed as a racist and a Nazi stunned Nelsen. Prior to living in China, Nelsen had written an article for a neighborhood weekly called the *East Villager,* in which he had advocated open borders on the grounds everyone in the world had the right to pursue happiness anywhere in the world regardless of freedom-killing, government-imposed borders. And, despite the best efforts of the entire New York City press corps, nothing could be found in his personal history, his writings, his statements, his associations, or in any aspect of his life that

---

[1]   Billboard Foes Yearn to Breathe Free Without Its Presence, New York Times, October 22, 2000
      https://www.nytimes.com/2000/10/22/nyregion/neighborhood-report-brooklyn-heights-billboard-foes-yearn-breathe-free-without.html

could be described as even remotely racist. He was hardly a xenophobe. As blogger Lawrence Auster wrote on October 15, 2008, six years after the SPLC had attacked Nelsen as a racist neo-Nazi, upon reading an article Nelsen had written discussing immigration's impact on the white American majority,

> *"When I met Craig Nelsen years ago, around the time he was getting started with ProjectUSA, and talked immigration with him, he was focused on the negative effects of immigration-caused population growth. He eschewed any concern about the effect of immigration on the racial and cultural character of our society, let alone on the white race as the white race. He's traveled some distance since then."[2]*

What had been the path traveled by Nelsen? In one illustrative incident, New York's Fox 5 TV station contacted Nelsen, requested an interview, and asked whether he could also bring along some "followers". Nelsen agreed and brought two local supporters, both of whom had contributed money to the billboard campaigns. One was an African-American man from Brooklyn, who understood the downward pressure on wages mass immigration put on the teens and low income workers in his neighborhood. The other was an immigrant from India, who was most concerned about the massive fraud that occurs in the immigration industry. As the cameras were being set up, the two ProjectUSA supporters were telling the reporter, Mary Garofalo, why they felt the country needed an immigration time-out. Interrupting, she pointed at Nelsen, saying, "Look, I understand why *he*'s here. What I don't understand is why *you* are here." In other words, Garofalo couldn't even hear the words coming out of their mouths. The only pertinent fact to her was their skin color. By these and other experiences, Nelsen learned that immigration was, for many, including Mary Garofalo, absolutely a racial issue. This raised an interesting question: if the immigration issue is absolutely a racial issue, then what are the racial reasons for Mary Garofalo's support for mass immigration, or Dov Hikind's, or Jon Stewart's, or

_____

2   http://www.amnation.com/vfr/archives/011640.html

the Southern Poverty Law Center's?

7.    The SPLC's article about Nelsen and ProjectUSA was contemptible for its substance and methods, but chilling in its effectiveness. In the Internet age, not only does a hit piece work, it works forever. Long after ProjectUSA closed down operations, that article continued to follow Nelsen, jettisoning career opportunities, poisoning social relations, and serving as an effective deterrent against anyone else who might be thinking of criticizing current immigration policy.

8.    In January, 2018, in Lexington, Missouri, that article once again reared up and derailed Nelsen's plans when a local woman named Deborah Starke Bulloc discovered it online and posted it on the Facebook group, Lexington Bulletin Board. But this time, the impact of that article was more than just another career setback. This time, especially when the SPLC reworked the old smear and republished it as another attack in the January 24, 2018 article that is the basis for the causes of action enumerated herein, it had deadly consequences. But, that story begins three years earlier while Nelsen was living in Baltimore, Maryland.

*Baltimore panhandlers*

9.     Like everyone in Baltimore, Nelsen had noticed the explosion in the city's panhandling population. At nearly every major intersection, a Baltimore motorist was likely to see one or more panhandlers plying their need among the cars waiting at the red lights. Remarkably, even though only about twelve percent of Baltimore's population are white males,[3] nearly all of the panhandlers were white males—not only white and male, but young and able-bodied white males.[4] Any new phenomenon with such an extreme skew is significant. Nelsen began pulling

_____

3   https://statisticalatlas.com/place/Maryland/Baltimore/Race-and-Ethnicity
4   Plaintiff made two videos in 2015/2016 while the RJBC was in the idea stage. The can be seen online <u>Dave</u>
    http://robinsonjeffersboxingclub.com/library/video/dave-baltimore-apr-2016.mp4 and <u>Josh</u>

over, getting out of his vehicle, and talking to the panhandlers to try to learn more about this social phenomenon. The common denominator among the panhandlers he spoke with was heroin addiction.

10. Nelsen and Davis also learned that white males, while only thirty percent of the US population, are seventy percent of the nation's suicides. Couple that with the opioid abuse—a form of slow suicide—and Nelsen and Davis understood a human catastrophe was underway among a specific and identifiable segment of Americans. There was no denying something had happened that left millions sapped of the will to live, and while there were, of course, plenty of exceptions, those millions could be broadly identified by race, by gender, and by age—young to middle aged white males. The question was: why was it happening?

11. From his experience with ProjectUSA and the vicious attacks—including attacks from the SPLC—on him and his group more than a decade earlier, Nelsen had come to believe that a debilitating, spirit-sapping bigotry against whites permeated the culture. While the National Association of La Raza openly advocated for Latino interests, the Anti-Defamation League openly advocated for Jewish interests, and the National Association for the Advancement of Colored People openly advocated for African-American interests—all without the slightest censure—the completely race-neutral ProjectUSA had been attacked viciously by Defendant and others as a racist organization. The other groups made no secret of their racial activism, indeed, were rewarded for it with grants from the Ford Foundation and federal and state governments. Meanwhile, ProjectUSA was attacked for *secretly* advocating for the interests of whites!

_____

http://robinsonjeffersboxingclub.com/library/video/josh-baltimore-apr-2016.mp4

12.    Clearly, a giant double standard was at work in American society. The impact on a young white American growing up under that double standard is likely significant. From childhood, he or she will be a victim of racism and racial denigration countless times—in the cinema, in the media, in the street, in the classroom, in the workplace—a racism the existence of which they must deny—or be guilty of...racism! Even if he succeeds in denying the existence of the racism of which he is the constant victim, he must learn that, in fact, whiteness itself is the *embodiment* of racism. Taught from infancy that diversity is our strength, it dawns on him that diversity just means "not white", and from that he has had to conclude that whiteness is our weakness. When he succeeds in life, it is an unearned result of privilege. When he fails, therefore, he is doubly to blame. And because of his implicit, unconscious racism, he is even to blame for the failures of others. He is taught that his institutions are instruments of oppression, and he and his ancestors the oppressors. In school, he learns that his country was founded on genocide and built by immigrants and made wealthy on the backs of slaves. From movies he learns that slavery itself is the primary fact of his history. Above all, he knows that racism is the cardinal sin and it is embedded in the color of his skin, and *his* skin only. Evil, it turns out, is genetic. Overcoming whiteness, then, not to mention toxic masculinity, is impossible for the white male save for one solution, which also happens to be a permanent solution. Nelsen concluded that this pervasive cultural bigotry against whites was the most likely reason white males were in a crisis of suicidal self-loathing. It was the only position Nelsen could discover that could explain the sudden phenomenon of so many young white males in despair selling their degradation at the traffic lights of Baltimore in order to buy the method of their own extinction.

13.    Right or wrong, Nelsen's position is at least a defensible one—a position that can be held without needing to hate anyone.

14.     Nelsen had another avenue through which to analyze the human tragedy unfolding across the
        nation. As a youth, Nelsen attended New York University and had taken an apartment in New
        York's Alphabet City on the Lower East Side of Manhattan—an area of town so dangerous at
        the time taxi drivers would sometimes agree to take one only as far as Second Ave. The
        affordability of the apartment came at a cost: heroin was everywhere; it was even sold by
        dealers in the vestibule of his building. It wasn't long before Nelsen developed his own severe
        heroin addiction. By the time Nelsen came across the panhandlers of Baltimore, however, he
        had been clean for thirty years. But his experience as a junkie many years earlier allowed him to
        analyze the situation of the Baltimore panhandlers in light of his own recovery—as someone
        who had been through it. And that was how the Robinson Jeffers Boxing Club came into being.

## Defendant (SPLC)

Defendant **Stephen Piggot,** the author of the defamatory material at issue in this action, is a
natural person and an employee of the Southern Poverty Law Center.

Defendant **Richard Cohen**, a natural person and President, Southern Poverty Law Center

Defendant **Morris Dees,** a natural person, founder, and Chief Counsel, Southern Poverty Law
Center

Defendant **Heidi Beirich**, a natural person, leads the Southern Poverty Law Center's
Intelligence Project, which publishes the Intelligence Report and the Hatewatch blog.

Defendant **Southern Poverty Law Center** (SPLC) is a business in Montgomery, Alabama,
where it maintains a website (splcenter.org). At all times Defendant was acting by or through its
authorized agent(s), employee(s), representative(s) or owner(s). The Southern Poverty Law
Center is liable for the defamation because Stephen Piggot made the defamatory statements
within the scope of his agency with the Southern Poverty Law Center.[5]

### *Not your father's non-profit tax-exempt civil rights group*

15.     In 1971, after the civil rights victories of the 1960s had been won by organizations like the

---

5   See Papa John's USA, Inc., 366 S.W.3d at 120 ("[R]espondeat superior imposes vicarious liability on employers for the
    negligent acts or omissions of employees or agents as long as the acts or omissions are committed within the scope of
    the employment or agency." (quoting Lindquist, 168 S.W.3d at 655-56)))

SNCC,[6] and the SCLC,[7] the SPLC was founded in Montgomery, Alabama by an attorney named Joe Levin and a local direct-mail marketeer named Morris Dees, who was so good at junk mail he is in the Direct Mail Hall of Fame.[8] Defendant is a 501(c)(3) organization recognized as a tax-exempt charity by the IRS. For its most recent tax year, Defendant reported an astounding $136 million in income, a 244 percent increase over the previous year. The organization has nearly a half billion dollars in assets[9], with a substantial portion of it parked in bank accounts in off-shore tax havens.[10]

16.     The SPLC, its founders, its management, its attorneys, and its writers—including the writer of the article at issue here—are especially sophisticated users of the written word. The language used in its fundraising material is legally precise and, with emotive virtuosity, milks the generosity and good intentions of Americans who believe, when they write a check to the SPLC, they are rewarding champions of civil rights and supporting equal justice for all. It is becoming increasingly apparent, however, to a growing number of Americans that a contribution to the SPLC rewards fear-mongering, supports the bloated salaries of a few at the top of the organization, and foments hatred and division in our society.

17.     "Demagogic Bully" was the title of a July 2017 article in the Manhattan Institute's *City Journal.* "The SPLC's authority derives from its presumed occupation of a moral high ground, which is belied by its record of character assassination, questionable fundraising practices, excessive salaries, and poor ratings from philanthropic monitors," the *City Journal* wrote. Quoting the widely admired progressive journalist, Alexander Cockburn, the author, Mark Pulliam,

_____

6   Student Nonviolent Coordinating Committee 1969 – 1976, Atlanta, Georgia
7   Southern Christian Leadership Conference 1957 -, Atlanta, Georgia (Martin Luther King Jr)
8   http://www.dmnews.com/agency/dma-names-4-to-hall-of-fame/article/59534/
9   $477 million in assets, Form 990, 2018
10  Bermuda, Cayman Islands, and the British Virgin Islands, Form 990-T, 2015

continued, "I've long regarded Morris Dees and his Southern Poverty Law Center as collectively one of the greatest frauds in American life."[11]

18.    The conservative magazine, *National Review,* echoed the sentiment from the other end of the ideological spectrum, "There was a time when the Southern Poverty Law Center did useful work reporting on actual hate groups such as the KKK. These days, though, the SPLC is simply a MoveOn or Media Matters–style outfit. Its core mission now is trying to marginalize and shut up even mildly right-of-center voices by calling them instruments of hate, making increasingly strained attempts to tie conservative commentators, authors, political figures, and professors to the alt-right or neo-Nazism."[12]

19.    The SPLC's main claim to fame was a mid-1980s court victory over the already moribund and widely reviled KKK. As the left-leaning magazine, *Harper's,* explained in a devastating 2002 exposé, "In 1987, [founder Morris] Dees won a $7 million judgment against the United Klans of America on behalf of Beulah Mae Donald, whose son was lynched by two Klansmen. The UKA's total assets amounted to a warehouse whose sale netted Mrs. Donald $51,875. According to a groundbreaking series of newspaper stories in the *Montgomery Advertiser*, the SPLC, meanwhile, made $9 million from fund-raising solicitations featuring the case, including one containing a photo of Michael Donald's corpse."[13]

20.    While its early work may have been unobjectionable, a piece in the *New York Times* concluded that today "...the S.P.L.C. is an organization that has lost its way, smearing people who are fighting for liberty and turning a blind eye to an ideology and political movement that has much

---

11  https://www.city-journal.org/html/demagogic-bully-15370.html
12  https://www.nationalreview.com/2018/03/southern-poverty-law-center-bias-hate-group-labels-scam/
13  https://rkeefe57.files.wordpress.com/2015/01/church-of-morris-dees.pdf

in common with Nazism."[14]

21.   *Investors Business Daily* agrees, writing in June, "The SPLC smears individuals and groups it

      differs with by labeling them as some form of 'hater' – 'racist,' 'white supremacist,' 'extremist'

      and the like."[15]

22.   The SPLC smear machine is enabled by a lazy or credulous media, as noted by the *Jewish*

      *Policy Center* in December, 2017, "Journalists and academics often rely uncritically on the

      Southern Poverty Law Center as a source of information about hate groups and racism in the

      United States, particularly bigotry said to stem from the far right." The report warns, "Is SPLC

      a reliable source on bigotry and hatred in the United States, a money-raising machine, or

      combination of both? Does it rigorously define and uncompromisingly expose prejudiced

      individuals and groups, or conflate them with the center's political opponents? Due diligence by

      journalists seems to be required."[16]

23.   But that due diligence is far too infrequent, says the *Cincinnati Enquirer.* In September 2017,

      under the headline "**Wise up to Southern Poverty Law Center's scam**", the paper excoriated

      the SPLC. "For too long now respectable newspapers and other news outlets have lent

      credibility and succor to one of the most dishonest and unprincipled 'civil rights' organizations

      in America. Under the guise of identifying and fighting 'extremist hate groups,' the Southern

      Poverty Law Center has actually become one. And a rich one at that."[17]

24.   Just months later, the *Tablet Magazine*, an American Jewish online publication, wrote

---

14  https://www.nytimes.com/2017/08/24/opinion/southern-poverty-law-center-liberals-islam.html
15  https://www.investors.com/politics/columnists/splc-prager-university-hate-groups-left-wing/
16  https://www.jewishpolicycenter.org/2017/12/17/18072/
17  https://www.cincinnati.com/story/opinion/contributors/2017/09/15/wise-up-southern-poverty-law-centers-
    scam/666904001/

Case 4:18-cv-00895-RK   Document 6   Filed 11/27/18   Page 13 of 62

scathingly "the once venerable organization has abandoned its core mission, focusing instead on dirty partisan politics...The SPLC has half a billion dollars and seemingly endless appetite for such character assassination campaigns, which should trouble anyone committed to unfettered inquiry, intellectual exchange, and the other old-fashioned values for which journalism, academia, and other high-minded pursuits once stood."[18]

25.     And an article earlier this year in *Reason Magazine* blistered the SPLC for the gross self-enrichment practiced by the top management of the "civil rights champions", writing, "Morris Dees, the Center's founder, pays himself nearly half a million dollars a year. Although Dees once promised that when the Center's endowment reached $50 million, he'd stop fundraising, he didn't stop. Now the Center has $320 million dollars stashed away — much of it in the Cayman Islands. It's all in their tax returns...the Southern Poverty Law Center has become a hate group itself. It is now a left-wing, money grabbing, slander machine."[19]

26.     Amy Sterling Casil, CEO of Pacific Human Capital, a California-based consulting firm for nonprofits and charitable organizations was particularly appalled by the SPLC's enormous holdings off-shore. In a *Washington Free Beacon* article last year, which noted how little the SPLC money machine actually spends on its supposed cause, Ms Casil was quoted, "I've never known a US-based nonprofit dealing in human rights or social services to have any foreign bank accounts. My impression based on prior interactions is that they have a small, modestly paid staff, and were regarded by most in the industry as frugal and reliable. I am stunned to learn of transfers of millions to offshore bank accounts. It is a huge red flag and would have been completely unacceptable to any wealthy, responsible, experienced board member who was

18  https://www.tabletmag.com/jewish-news-and-politics/260735/splc-klan-hunters-to-smear-machine
19  https://reason.com/reasontv/2018/01/16/the-southern-poverty-law-center-scam

committed to a charitable mission who I ever worked with. It is unethical for any US-based charity to invest large sums of money overseas. I know of no legitimate reason for any US-based nonprofit to put money in overseas, unregulated bank accounts."[20]

27.     The SPLC had to fork over some of their enormous cash stash recently when they got spanked in court as reported in a syndicated column in the *Washington Post* last June: "After years of smearing good people with false charges of bigotry, the Southern Poverty Law Center (SPLC) has finally been held to account. A former Islamic radical named Maajid Nawaz sued the center for including him in its bogus 'Field Guide to Anti-Muslim Extremists,' and last week the SPLC agreed to pay him a $3.375 million settlement and issued a public apology."[21]

28.     In the wake of that humiliation, reports the *Washington Times* in a June 20 article, a "coalition of 45 prominent conservative groups and figures called Wednesday on those partnering with the Southern Poverty Law Center to sever their ties, saying the center's credibility has been further eroded by this week's defamation settlement."[22]

29.     The day after the *Washington Times* article ran, the *Wall Street Journal* came to the defense of yet another SPLC target, whom "the Southern Poverty Law Center falsely labels...a 'white nationalist.'...A clear illustration of the SPLC's pervasive and insidious influence is the March riot at Middlebury College, where [social scientist Charles] Murray had been invited to speak. 'The SPLC is the primary source for the protesters at my events,' Mr. Murray told [the interviewer]. 'It is quotes from the SPLC, assertions by the SPLC that drive the whole thing.'"[23]

_____

20  https://freebeacon.com/issues/southern-poverty-law-center-transfers-millions-in-cash-to-offshore-entities/
21  https://www.washingtonpost.com/opinions/the-southern-poverty-law-center-has-lost-all-credibility/2018/06/21/
22  https://www.washingtontimes.com/news/2018/jun/20/conservatives-call-companies-cut-ties-discredited-/
23  https://www.wsj.com/articles/the-insidious-influence-of-the-splc-1498085416

Case 4:18-cv-00895-RK   Document 6   Filed 11/27/18   Page 15 of 62

30.     The policy position that guarantees a smear by the SPLC is advocacy of immigration reduction. After Kansas governor Kurt Kobach was heckled by protesters who spewed inflammatory, injudicious SPLC rhetoric at him, immigration proponent Sam Peak, writing in the *Kansas City Star*, admonished the protesters. "But the SPLC's history of recklessness isn't the only reason why citing it is a liability for immigration advocates," he wrote. "Even when it is correct, it employs guilt by association tactics that are unable to withstand serious scrutiny."[24]

31.     On top of the public's revulsion for schemes that use tax-exempt charities for self-enrichment and on top of the public censure the SPLC has attracted by the exceedingly objectionable tactics it employs to advance its agenda, the SPLC's agenda *itself* is raising questions. In June 2017, *Politico* wondered, "Is tough immigration control really a form of hate, or just part of the political conversation? Does rejecting a religion make you an extremist? At a time when the line between "hate group" and mainstream politics is getting thinner and the need for productive civil discourse is growing more serious, fanning liberal fears, while a great opportunity for the SPLC, might be a problem for the nation."[25]

32.     Indeed, one might question whether the SPLC's public agenda is even its actual agenda. On its website, the SPLC describes itself as "a nonprofit civil rights organization dedicated to fighting hate and bigotry, and to seeking justice for the most vulnerable members of society". The SPLC is "work[ing] toward the day when the ideals of equal justice and equal opportunity will be a reality".[26] To that end, the SPLC claims it "monitors hate groups and extremists throughout the United States and exposes their activities to law enforcement agencies, the media and the

---

24  https://www.kansascity.com/opinion/readers-opinion/guest-commentary/article206870469.html#storylink=cpy
25  https://www.politico.com/magazine/story/2017/06/28/morris-dees-splc-trump-southern-poverty-law-center-215312
26  https://www.splcenter.org/about

public"[27] by publishing a list of "[i]ncidents of apparent hate crimes and hate group activities" which "are drawn primarily from media sources."[28] In other words, in furtherance of its stated agenda, says the SPLC, it scours news reports for hate making a list of hate "crimes" and "activities", then it "exposes" the haters online and to law enforcement and media outlets. But just how well does the SPLC's list of hate incidents reflect its stated agenda? Here is a hate incident from 2010 that made national news but somehow did *not* actually make the the SPLC's list of hate incidents:

a) In August 2010 in Des Moines, 30–40 black youths attacked white people at random in and around the Iowa State Fairgrounds, an event the mob called "Beat Whitey Night".[29] The violence left one young white man with a fractured skull, and two police officers injured. Even though the incident was widely reported and involved attacks on law enforcement officers, the SPLC ignored "Beat Whitey Night" entirely. The only hate crime listed in the SPLC's list of hate crimes for Iowa in 2010 was this one

| Des Moines, Iowa | Vandalism |
| --- | --- |
| Vandals painted a swastika and the letters "KKK" on a man's truck. | |

Reported July 21, 2010

b) In August 2011, there was another overlooked incident at neighboring Wisconsin's state fair. "According to witnesses, a group of anywhere from 30 to 100 young black men descended on the Wisconsin State Fair, beating fairgoers and looting carnival games, in what witnesses said were racially-motivated attacks...One witness named Eric, an Iraq veteran, said the

_____

27 https://www.splcenter.org/fighting-hate
28 https://www.splcenter.org/fighting-hate/hate-incidents
29 https://www.youtube.com/watch?v=VhmxWyli0Yw

attacks reminded him of war: 'I had a black couple on my right side, and these black kids were running in between all the cars, and they were pounding on my doors and trying to open up doors on my car, and they didn't do one thing to this black couple that was in this car next to us. They just kept walking right past their car. They were looking in everybody's windshield as they were running by, seeing who was white and who was black. Guarantee it....I saw them grab this white kid who was probably 14 or 15 years old. They just flung him into the road. They just jumped on him and started beating him. They were kicking him. He was on the ground. A girl picked up a construction sign and pushed it over on top of him. They were just running by and kicking him in the face.'"[30] (WTMJ-TV, *Business Insider*) "Wisconsin police say a mob attack at the Wisconsin State Fair was racially motivated. One teen arrested Wednesday said he deliberately targeted white fairgoers because they were 'easy targets.'"[31] (*Christian Science Monitor*) Even though police pursued hate crime charges in the attacks and publicly called the attacks 'hate crimes', and even though the attacks were widely reported as hate crimes in national media, the lone entry on the SPLC's list of Wisconsin hate crimes for August, 2011 is this one:

| Berlin, Wisconsin | Legal Developments |
|---|---|
| Paul Captain, 49, was allegedly charged with a hate crime for sending threatening and racist e-mails to the Wisconsin State Fair spokeswoman. | |

Reported August 11, 2011

Those are just two of many examples putting the lie to the SPLC's claim it is fighting "hate".

You can't ignore violent racially-motivated actual hate crimes, and then claim you are fighting

---

30  https://www.businessinsider.com/race-war-heats-up-at-wisconsin-state-fairwait-the-race-war-2011-8
31  https://www.csmonitor.com/USA/Justice/2011/0812/Wisconsin-State-Fair-mob-attack-Police-seek-hate-crime-charges

hate by labeling those with whom you disagree on immigration policy as hate groups and racist extremists.

33.     But it isn't just immigration restrictionists the SPLC smears with reckless abandon. Karl Zinsmeister in *Philanthropy Roundtable* lists examples of a wide spectrum of political opponents the SPLC has smeared as traffickers in hate. They "include former Cincinnati mayor and Ohio Secretary of State Kenneth Blackwell, think-tank president Frank Gaffney, Cliff Kincaid of the press watchdog Accuracy in Media, former Lieutenant General Jerry Boykin, WorldNetDaily journalist Joseph Farah, Rafael Cruz, a Cuban immigrant and father of a U.S. Senator, legal gadfly Larry Klayman, and immigration restrictionist Dan Stein, philanthropist Ron Unz, bestselling author Dinesh D'Souza, regular Congressional testifier Mark Krikorian, former senator and Governor George Allen, U.S. Attorney General Jeff Sessions, former Congressman Tom Tancredo, former Congressman and Presidential candidate Ron Paul, and scores of other public-spirited Americans active in national debates have likewise been slurred and defined as beyond the pale by the SPLC. So have charities like James Kennedy's Coral Ridge Ministries, the Federation for American Immigration Reform, the Center for Immigration Studies, the World Congress of Families, the National Organization for Marriage, Liberty Counsel, and hundreds of others. It is entirely fair to disagree with any of these charities or individuals—but utterly unfair to insist they are hate criminals. The largest category on the SPLC "haters" list is "anti-government groups." (663 entries!) This dragnet catches the tea party and patriot organizations that are suspicious of centralized power, which last we checked was a long and honorable American tradition. What is not part of an honorable American tradition is the course of action prescribed by SPLC Senior Fellow Mark Potok: 'Sometimes the press will describe us as monitoring hate crimes and so on…. I want to say plainly that our aim

in life is to destroy these groups, to completely destroy them.'"[32] [33]

34.     In summary, the SPLC maintains a public image that is inaccurate and calculated to mislead members of the public for the purpose of 1) scamming donors, 2) disguising their true agenda, and 3) destroying their political opponents. Therefore, the SPLC acted purposely in the defamation hereinafter alleged, and the 'state of mind' component needed in order to satisfy the "actual malice"[34] standard in a defamation case seeking punitive damages is established.[35]

## **JURISDICTION AND VENUE**

35.     This Court has original jurisdiction over this action and the the SPLC pursuant to 28 U.S.C. Sec. 1332 (a)(1) in that the matter in controversy exceeds $75,000 exclusive of costs and interest, and is between citizens of different states.

36.     This Court has personal jurisdiction over the the SPLC as the cause of action arose out of conduct occurring in Lafayette County, Missouri and covered by Missouri's long arm statute and the the SPLC has had sufficient minimal contacts with Missouri to satisfy the requirements of due process. Additionally, the the SPLC has purposely availed themselves of the benefits and protections of Missouri and directed its activities at Missouri residents.

---

32 https://www.philanthropyroundtable.org/philanthropy-magazine/article/spring-2017-briefly-noted

33 Potok also has publicly admitted the SPLC is a scam, saying in a 2008 interview, "I think a lot of people feel, 'Oh, groups like the Southern Poverty Law Center, they find, you know, the two hundred Nazis running around the country, they build them up into great big groups, they make a big deal about it and then ask for your money,' right? In other words, it's kind of a scam. You hype up this little tiny threat into something scary, uh, and then go and try to make money off of it."

34 Gertz V. Robert Welch, Inc., (1974) No. 72-617

35 Herber v. Lando, 441 U.S. 153 (1979) Reliance upon such state of mind evidence is by no means a recent development arising from New York Times and similar cases. Rather, it is deeply rooted in the common law rule, predating the First Amendment, that a showing of malice on the part of the defendant permitted plaintiffs to recover punitive or enhanced damages. In Butts, the Court affirmed the substantial award of punitive damages, which, in Georgia, were conditioned upon a showing of "wanton or reckless indifference or culpable negligence" or "ill will, spite, hatred and an intent to injure. . . .'" 388 U.S. at 388 U. S. 165-166.

37.     Venue is proper pursuant to 28 U.S.C. Sec. 1391 (a)(2) as a substantial part of the events giving rise to this action occurred in Lafayette County, Missouri. The defamatory statements alleged were broadcast over the Internet and targeted residents of Lafayette County, Missouri, they concerned an undertaking in Missouri, and they were felt most keenly by and had the greatest meaning for the residents of Lexington, Missouri.[36] Moreover the harm flowing out from the SPLC's defamation of Nelsen washed first over some of Missouri's most vulnerable; specifically, it deepened the despair of men sinking into addiction and distress.

38.     The claim is timely, because an action for libel or slander that is first published in Missouri must be commenced within two years[37] and the defamatory material at issue in this action was published less than one year ago.

# STATEMENT OF FACTS

### Robinson Jeffers Boxing Club

39.     The Robinson Jeffers Boxing Club,[38] hereinafter RJBC, is a 13-week residency "life treatment" program for men with opioid addictions or who are otherwise in distress. The program calls for a healthy, primarily raw food diet, daily morning exercise, and a rigorous academic program including math, philosophy, literature,  music,  history,[39] and, to help the men conceptualize a

---

36 Baldwin v. Fischer-Smith, 315 S.W.3d 389, 391–92 (Mo. Ct. App. 2010).
37 Mo. Rev. State § 516.140 (2011)
38 https://robinsonjeffersboxingclub.com/
39 A key first step in the Plaintiff's opioid-free life was enrolling in the Great Books program at St Johns College in Santa Fe, New Mexico. Part of the required curriculum at the college was extensive history reading—not modern history textbooks, but historians like Tacitus, Livy, and Herodotus, writers who were more or less contemporary to the events they recorded. One morning, on the way to class, Plaintiff had an epiphany as he contemplated what he had been reading the night before. Verbatim: "Wow, we're not so bad after all!" White people—his people—were just people. They weren't especially evil, nor privileged, nor guilty, nor embarrassing, nor racist. They were just a group of flawed, distantly related individuals like all the other groups of distantly related individuals throughout history. This insight had a transformative effect on the Plaintiff. The shift that occurred in his world view was palpable and positive and he sought to incorporate it into the RJBC. Thus, the history component of the RJBC would present the addicts with an entirely different perspective on the Civil War, for example, than the denigrating one Hollywood has given them. They would

higher way of living, poetry.

40. In the evenings, there are movies that celebrate great themes like chivalry, honor, and American can-do-ism. Other evenings are devoted to Jordan Peterson videos and discussion, while other evenings are devoted to poker tournaments and chess.

41. Where possible RJBC is self-sufficient, growing its own food, doing its own housekeeping, making its own repairs, and building its own furniture. Upon graduation, the men know how to use tools.

42. But the core of the program is a daily two-hour intensive boxing training. Boxing gives men confidence in themselves and helps them learn to respect world rather than fear it. In the ring, men form healthy bonds of friendship with other men who drive them to test their limits. Boxing training requires a great deal of effort and demands personal courage. Therefore, it enriches the men and their experience of the world. When they leave RJBC, the world is no longer happening to these men; it is they who act in the world.

43. Nelsen put up a website for the club and described it as it is herein described. He expressed his theory that, as evidenced by official statistics on suicide and opioid abuse, white males were in a crisis of self-loathing. He argued that the Robinson Jeffers Boxing Club—designed to address the particular challenges faced by white males in modern America—could save lives, repair broken families, and help alleviate the ocean of suffering across the country.

44. On the website and in his correspondences, Nelsen made it clear that, while the program was

read the actual letters home from actual soldiers—both Union and Confederate—on the battlefield. They would read a book of oral histories told by former slaves in the immediate aftermath of the war. They would learn that their ancestors were humans, not demons; they would therefore see themselves more accurately as humans, as Americans, and as white men.

Case 4:18-cv-00895-RK   Document 6   Filed 11/27/18   Page 22 of 62

designed to address the specific challenges unique to white males in the United States, the program was open to, and would benefit, men in distress of any race.

45. Nevertheless, it became an issue that the program was designed to address the special challenges faced by white males—the very fact of which provides a powerful demonstration of the special challenges faced by white males that makes the program necessary in the first place (since a program run by the Mexican-American Legal Defense and Education Fund to address the challenges faced by Latino men would meet no such resistance and, in fact, would be lauded as admirably public-spirited).

46. The program was also intended for high IQ men, partly because of the demanding academic component of the program, but primarily because studies show that high IQ individuals are more susceptible to drug addiction than the general population,[40] meaning there is a cognition-dependent aspect to substance abuse. Moreover, while mainstream drug treatment programs are notoriously ineffective in general, with recidivism rates reaching 80 percent or higher, many people—Nelsen among them—believe that for high IQ individuals those programs are even less effective. Tragically, when an attempt to overcome drug addiction ends in failure, the negative light in which the addict sees himself in the world that made him vulnerable to addiction in the first place is intensified, reducing his value in his own eyes and, consequently, diminishing the incentive to try again. It's a phenomenon that makes traditional treatment programs for some addicts outright harmful. Nelsen made the decision early on to make the suitability of the program for, and benefit to, high-IQ individuals explicit so that men in that category who find themselves in distress and who are caught in a deadly vicious spiral might be reached more

---

[40] The Relation Between IQ and Drug Addiction, https://lighthousetreatment.com/the-relation-between-iq-and-drug-addiction/

readily by being addressed more directly.

*Lexington, Missouri*

47.   Patrick Welch, a resident of Washington, DC, but native of Lexington, Missouri, to whom
      Nelsen had explained the concept behind the Robinson Jeffers Boxing Club, found the idea
      worthwhile. Welch owned an eight thousand square foot former grocery store at 1419 Main St
      in Lexington that had been standing empty for several years. Welch told Nelsen that if he could
      make the idea work, the space was his to use.

48.   Sherman Davis, a resident and native of Washington, DC, to whom Nelsen had explained the
      concept behind the Robinson Jeffers Boxing Club, found the idea worthwhile. He committed to
      making the Robinson Jeffers Boxing Club a reality by accompanying Nelsen to Lexington, from
      Washington, DC and contributing "sweat equity" to the project. In particular, Davis acted as a
      videographer, documenting many hours of interviews with opioid addicts from Baltimore
      through hard hit Appalachia to St Louis and Kansas City, interviews by Nelsen of law
      enforcement personnel regarding the viability of the RJBC, footage of the property in
      Lexington, and interviews with Lexington residents and prospective clients on different aspects
      of the RJBC.[41]

49.   After arriving in Lexington on Christmas morning, 2017, Nelsen and Davis started cleaning up
      the grocery store, getting the water and gas turned on, and so on. Word began to spread in the
      small town of 4700 that they were about to open up a drug treatment center on Main St. People
      were going to the website, where they read that, while the program would be open to any man
      in distress, the program was created specifically with the special challenges faced by white

---

41  https://www.youtube.com/watch?v=XImd3hCoXGo

males in mind.

50.     There arose two public concerns. The first was that RJBC would bring drug addicts to Lexington. The second was that RJBC was a white supremacist organization. Plaintiff admits he did a poor job explaining their plans to the community and missed some good opportunities to allay fears. However, it was Nelsen's experience that when skeptical people understood what the RJBC program was about, and who it would help, and the thinking behind it, the skeptics' opposition softened or disappeared. While they may have misjudged their depth, it was Nelsen's belief that patient explanation would eventually assuage any concerns, and, as the townspeople got to know Nelsen and Davis, they would see that those concerns had been misplaced.

51.     Both Welch and Davis know Nelsen well, and have known him for many years. It is impossible to imagine that Welch, who has family members living in Lexington, who maintains a second home in Lexington and spends more than half of his weekends with his wife and children in Lexington, where he is well-known in the community since kindergarten, and where he enjoys a good reputation, would offer on a handshake access to a large property on Main St to a racist looking to capture the town for neo-Nazis by flooding it with heroin addicts. It is equally impossible to imagine that Davis, an African-American, would uproot himself from his home town and set out with Nelsen on a journey halfway across the country in the dead of winter on a speculative effort to establish a beachhead for white supremacy. A chance for the people of Lexington to get to know Plaintiff never arrived, however, thanks to Facebook postings by Bill Sellers[42] and Deborah Starke Bullock.

---

42  The posting by Bill Sellers was "directly quoted language" from a letter Plaintiff had written him six months earlier seeking his support for the effort. Sellers never responded. When he posted the "directly quoted language", he posted the entire letter but omitted this sentence, "While the program will address the particular challenges faced by white men, we will accept males of any race with a heroin addiction and who are seeking help."

*The SPLC enters the picture*

52.     Sometime during the second week of January, local resident Deborah Starke Bullock came
across one or more of the attacks on Nelsen by the SPLC from 15-20 years earlier alleging
Nelsen was anti-immigrant, racist, and in the pay of neo-Nazis. Bullock posted the SPLC
attacks on Nelsen on the Facebook group, Lexington Bulletin Board. The effect was immediate.
What had been a vigorous on-line question and answer instantly transformed into a howling
mob demanding Nelsen be run out of town. The public concern having to do with "bringing
drug addicts to Lexington" disappeared and "white supremacy" was the only issue.

53.     Word of the controversy reached the Southern Poverty Law Center, somehow, which quickly
repackaged the old attacks updated to fit the current situation and re-published them in an
article titled, "**Anti-immigrant activist Craig Nelsen resurfaces In Missouri, attempting to
start boxing club for opioid addicts**"[43] on January 24, 2018 on the SPLC's Hatewatch blog.

54.     The January 24 article reads:

> *Craig Nelsen, a longtime anti-immigrant activist with a history of promoting*
> *white nationalist ideals, has resurfaced in Lexington, Missouri, after years*
> *of inactivity.*
>
> *Nelsen, the former leader of the anti-immigrant group, ProjectUSA, is*
> *attempting to start a "boxing club" for "high IQ white male heroin*
> *addicts." In a letter sent to a Lexington resident in September of 2017,*
> *however, Nelsen claimed, "While the program will address the particular*

---

43 https://www.splcenter.org/hatewatch/2018/01/24/anti-immigrant-activist-craig-nelsen-resurfaces-missouri-attempting-
start-boxing-club

*challenges faced by white men, we will accept males of any race with a heroin addiction who are seeking help."[44]*

*Nelsen's scheme for his "Robinson Jeffers Boxing Club," named after the American poet, would see male "high-IQ" opioid addicts pay Nelsen $185 a week for a 13-week program consisting of a "strict daily regimen of exercise, a healthy diet, and rigorous academic study. Such study would include higher mathematics, literature, philosophy, biography, music, history, and poetry." At the core of Nelsen's proposed program is boxing which he says, "teaches a man that when life throws a punch, a man punches back."*

*Nelsen's fixation on high IQ is an age-old white nationalist trope. In fact, in 2002, his anti-immigrant group ProjectUSA received $10,000 in funding from the Pioneer Fund, a group started in 1937 to pursue "race betterment." For decades, it funded studies of race and intelligence, as well as eugenics, the "science" of breeding superior human beings that was discredited by various Nazi atrocities. It has supported many of the leading race scientists of the last several decades as well as anti-immigrant groups such as the Federation for American Immigration Reform (FAIR). Nelsen once sat on FAIR's advisory board.*

*Nelsen started ProjectUSA in 1997 in New York. The group made a name for itself by sponsoring racist billboards. One on display in New York City depicted a white boy and the words, "Immigration is doubling U.S.*

_____

44  This was the same letter referenced earlier from which Bill Sellers posted "directly quoted language".

*population in my lifetime. (Please don't do this to us Congress)." The group*

*claimed 3,000 members but went dormant in the mid-2000s.*

*A number of Lexington's 4,000 residents are not happy at the prospect of*

*Nelsen relocating to their town and setting up this club. One resident*

*compared Nelsen's arrival in Lexington to that of neo-Nazi Craig Cobb, who*

*attempted to start a whites-only colony in the tiny town of Leith, North*

*Dakota, in 2012.*

*Though Nelsen is not a neo-Nazi, he is certainly sympathetic to the white*

*nationalist cause. In a letter he sent to residents announcing his scheme,*

*Nelsen wrote, "I believe the devastation among white males is the*

*predictable result of decades of white male bashing in popular culture. By*

*the time a white male graduates from college, he has been subjected to*

*assaults on his dignity, his manhood, his history, and his culture." Later in*

*the letter, Nelsen claimed the club is open to all races, but he isn't*

*convincing anyone. Articles on the archived ProjectUSA website by Nelsen*

*include subjects such as "The White Minority."*

*Before Nelsen presented his plan at a Planning and Zoning Committee*

*meeting, on January 16, not a lot was known about the club, aside from an*

*interview he gave to local media and online images of letters he sent to*

*community members. The meeting drew a large crowd, but in the week*

*since, Nelsen as only resorted to getting in virtual boxing matches with*

*residents and his grand plan for Lexington remains, at least for now,*

*between rounds.*

55.    The SPLC's January 24 "Hatewatch" article terrified many local residents, who were misled by
       the article into believing the two men cleaning up the old "Snooze-U-Lose" on Main St were
       white supremacists on a secret mission to establish a Nazi recruitment center right next to the
       Maid-Rite Cafe.[45]

56.    Though Nelsen and Davis hadn't even started construction at the location, they were served with
       a stop work order from the city of Lexington threatening them with arrest if they didn't stop
       construction.[46]

57.    Pat Welch, the owner of the property and a Lexington native, who supported Nelsen's effort,
       and who had been defending Nelsen in the town and reassuring nervous city officials and
       residents by vouching for his character, was shaken by the SPLC's attack to the point he
       expressed his view that it was time to throw in the towel.

58.    Bob Levy, a popular local football coach who works with troubled youth and who had been
       enthusiastic about the program—even consenting to appear in a fundraising video[47] for it and
       placing his own gym at RJBCs service—stated on Facebook that the "revelations" about Nelsen
       were "scary" and that he would not have done the video had he known. Several residents
       expressed sympathy for Levy at having been "duped" by Nelsen into doing the video. Nelsen

---

45 This and many other examples proving claims made throught this complaint will be shown by Facebook postings.
46 A young father from Lexington with a winning personality and long struggle with heroin addiction happened to be there
   when the city official arrived to serve Plaintiff with the stop work order. The young father had been discussing his
   participation in the effort with Plaintiff including making this fund-raising ad for kickstarter (which rejected RJBC after
   SPLC defamatory letter). He was excited about the program, telling Nelsen and Davis something they had already heard
   many times from addicts, from addicts' loved ones, and from law enforcement professionals when they heard about the
   RJBC program: from the minute he first read about the program, he knew it was exactly what he'd always needed. He
   had even been able to withstand the controversy swirling around their effort, having satisfied himself through personal
   investigation as to Nelsen's and Davis' characters. Here is an agreement he was set to sign. But with the publication of
   the defamatory statements and the city serving Plaintiff with the stop work order right in front of him, he left, and,
   despite repeated attempts, neither Nelsen nor Davis saw or spoke with him again.  Here is an unacknowledged January
   26 letter to the city recounting the incident and requesting the stop work order be rescinded.
47 https://www.youtube.com/watch?v=XImd3hCoXGo

removed the fundraising video and did not air it again.

59.   Numerous posts on Facebook excoriated Nelsen, calling him names, and expressing extreme
      displeasure at his presence in town. Some Facebook posters posted Nelsen's physical location.

60.   On the night of January 27, Nelsen was in front of the store when what appeared to be a car
      occupied by young white males drove by. One of them rolled down the window and yelled
      "racist bastard" at Nelsen.

61.   Doug Booker, the owner of the Facebook group that served as a community bulletin board, met
      with Nelsen and Davis. Afterward he posted his impression that Nelsen had been unfairly
      maligned and uploaded a picture of himself standing between Nelsen and Davis. Some residents
      were so enraged at Booker's failure to condemn Nelsen that they quit his group and formed a
      rival Facebook group.[48]

62.   On Wednesday, January 10th, Nelsen and Davis met with Olivia O'Dell, a reporter for the
      Richmond Times, for about two hours at The Big Muddy, a local coffee shop. Afterwards, she,
      too, tried to defend Nelsen against the scurrilous charges from the SPLC, saying her impression
      of Nelsen was not congruent with the person portrayed in the SPLC's attack on him. For that,
      she was subject to abuse and ridicule on line, even from her own mother.

63.   In February, as Nelsen was walking in broad daylight toward the Cenex gas station on Hwy 13,
      someone yelled from a passing car, "Go home, Nazi. We don't want your shit here."[49] Nelsen

---

48 Plaintiff, who was still trying to reason with the people misled by Defendant, attempted to join that new group, too, and
   was rejected and ridiculed for even trying.
49 Plaintiff's theory regarding the causes behind the opioid crisis might have merit, or he might be a crackpot, but given the
   scale of human suffering at issue, it is an outrage against human decency that Defendant's well-honed method of
   character assassination and defamation prevented even a simple test of Plaintiff's theory. What, other than a deep
   animus, could explain why anyone would object to an attempt—any attempt—to alleviate the undeniable, documented,

did not want to give up this marvelous opportunity that could do so much good for so many families, and had such financial promise besides, but having vicious slurs yelled at you by complete strangers is very demoralizing.

*Ryan Wilson*

64.     Just after dawn one cold Saturday morning, February 17, 2018, Nelsen and Davis were in front of the Main St location getting the van ready to go look for weathered boards. (They were exploring a possible alternative business use of the building with which to generate an income while the locals got to know them, after which they hoped to be able to start up the RJBC.) Next door, at a 24-hour laundromat, Ryan Wilson had spent the night keeping warm, but had been made to leave. He approached Nelsen and Davis and inquired whether they had any work for him. They did not have any work available, but told him they did, and bought him some breakfast at the McDonald's up the street.

65.     Wilson told Nelsen and Davis that he had grown up a couple of blocks from the 1419 Main St location, often playing pick-up football as a youth in the park across the street. He knew the town well and where to look for weathered boards. He was 24 years old, intelligent, addicted to heroin, and the father of an infant boy. He spent the morning with Nelsen and Davis collecting old boards.[50] After returning to 1419 Main St., where Wilson neatly stacked the small pile of wood, Wilson and Davis went next door to the Maid Rite diner and talked for four more hours.

66.     Davis possesses a special ability to listen well. When Davis returned, he stated to Nelsen that, in

_____

ongoing suffering of other human beings? It seems clear that the real social threat the January and February events in Lexington, Missouri exposed was not that Plaintiff has too much love for high IQ white men, it was that Defendant has too much hate for them.

50 Plaintiff and Wilson http://robinsonjeffersboxingclub.com/library/splc/ryan_wilson_craig_nelsen_lexington_mo_feb-17-2018.php

his view, Wilson was truly ready to turn his life around. Wilson was excited about the Robinson Jeffers Boxing Club and wanted to go through the program.

67.    Nelsen and Davis remained cleaning in the location until late in the evening February 17, 2018. Between 10:00 pm and midnight, Wilson stopped by and asked Nelsen whether he could spend the night in the location to stay warm as the temperature that night would drop below freezing.

68.    Lexington was still inflamed by the SPLC's attack on Nelsen. Nelsen and Davis had seen messages online from residents suggesting the townspeople take matters into their own hands if the city wouldn't get rid of the "Nazis on Main St". In that toxic climate, Nelsen decided that if a "client" were discovered spending the night at the store, it would be all the pretext authorities needed to arrest Nelsen and Davis. Reluctantly, Nelsen denied Wilson shelter for the night, and explained why. He asked Wilson to return early in the morning and they would figure out some way to help him.

69.    The next morning, Wilson did not return. By the afternoon, when he still hadn't shown, Nelsen and Davis were surprised and disappointed. Davis had been certain he would return. Later that day, a woman who had befriended Nelsen and Davis stopped by the store with her parents. She knew Wilson from having been his baby-sitter when he was a toddler. She and her parents had seen Davis and Wilson talking the day before in the Maid Rite diner. They had been struck by the length of the conversation. They were familiar with the program Nelsen and Davis were attempting to implement, and with Wilson's struggles with heroin addiction, and they had been encouraged at the thought Wilson may be getting his life turned around. They thought Nelsen and Davis would want to know that at about 2:00 am on a highway at the outskirts of town Wilson had been struck and killed by a hit-and-run driver.

*Throwing in the towel*

70.     In the wake of Wilson's death, Nelsen and Davis's frustration grew at the sheer needlessness of it. He and Davis had traveled to Lexington expressly to help distressed men like Wilson, but had been prevented for *political* reasons—reasons supplied primarily by the SPLC's and Bill Sellers' false and defamatory statements. It was an outrage that the SPLC could do so much damage with such impunity. But continuing the effort to stay in Lexington and make it work had become untenable and, shortly after the accident, Nelsen and Davis headed back to the East Coast.

71.     Nelsen and Davis left with their funds depleted. They had had to spend their savings on motels, food, utilities, and cleaning supplies over the two months they struggled to make the Robinson Jeffers Boxing Club accepted. But the controversy in Lexington after the SPLC's attacks made it impossible to use the great location in Lexington for fundraising and it pulled the plug on investment they had been counting on.

72.     They went back to Baltimore intending to try to revive the program in Baltimore, but now they were without jobs, money, or a place to live. Davis returned to DC, and Nelsen ended up living in his van on the streets of Baltimore and remains homeless.

73.     Nelsen's position is made more difficult by the ever-present SPLC venom that a simple Google search turns up on him. At one point, for example, Nelsen was able to secure an office space in a co-working environment in Baltimore called Impact Hub. On the first day there, within the first hour or two, staff at Impact Hub pulled up the SPLC's article attacking Nelsen. They called police and Nelsen was escorted out of the building![51]

_____
51 Photo of police escorting Plaintiff from Impact Hub  http://robinsonjeffersboxingclub.com/library/splc/impact_hub.php

74.     The SPLC describes itself as "seeking justice for the most vulnerable members of our society",
        yet showed not just indifference to some of the nation's most vulnerable, but outright hostility to
        Nelsen's effort to help them. It isn't clear how the cause of justice is served by shutting down a
        desperately needed effort to help addicts, but it is clear that what hundreds of the most
        vulnerable members of our society who will die today from opioid abuse or suicide really
        needed was a little compassion.

## COUNT I

**Defamation. Defendant falsely stated Plaintiff was not convincing anyone that the club was open to all races.**

75.     Comes now Plaintiff, and each of them, jointly and severally, and for Count I of this petition for
        damages against Defendant, and each of them, jointly and severally, and alleges and states as
        follows

76.     Plaintiff incorporates herein by reference each and every statement of the "Statements of Facts"
        as though fully set forth herein.

77.     Defendant was at fault in publishing the defamatory January 24, 2018 article, "**Anti-immigrant
        activist Craig Nelsen resurfaces In Missouri, attempting to start boxing club for opioid
        addicts**", or, in the alternative, published the article and all statements cited herein knowing
        they were false or with reckless disregard for whether they were true or false at a time when
        Defendant had serious doubt as to whether they were true

78.     Regarding the statement in the article, *"Nelsen claimed the club is open to all races, but he isn't
        convincing anyone."*

a)  A reasonable factfinder would conclude that "*he isn't convincing anyone*" is an assertion of objective fact."[52]

b)  The assertion "*he isn't convincing anyone*" is false as there were and are many in Lexington who were convinced RJBC was to be open to men of all races.

c)  That false assertion is hurtful in its own right because it places Plaintiff in a pariah position, but Defendant amplifies its offense by using it to mislead the public into believing another falsehood—that Plaintiff was lying when he *"claimed the club is open to all races"*.

d)  Consider a structurally analogous statement in a different context. Suppose Julia wrote, *"John claimed he invited Bob to the party, but he wasn't convincing anyone."*

   i.  After reading that statement, the typical reader would believe John probably hadn't invited Bob to the party.

   ii.  But suppose it were discovered that, in fact, John really *had* invited Bob, the reader would assume, while noting a possible undercurrent of hostility, the author, Julia, as well as the unconvinced others, had made some kind of mistake.

   iii.  If the reader then found out that there actually were some who were in fact convinced John had invited Bob to the party and, therefore, Julia's claim that John wasn't convincing anyone was false, the slight undercurrent of hostility the reader had detected would suddenly seem like a strong possibility of hostility.

   iv.  If the reader then further discovered that Julia actually had no factual basis for stating that

---

52 The determination of whether a statement is a pure opinion or an assertion of fact is a question of law. Nazeri v. Missouri Valley College, 860 S.W.2d 303 (Mo. Banc 1993). The test applied to determine if a statement is opinion is "whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." Id.; See, Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19, 110 S. Ct. 2695, 2705-2706, 111 L. Ed. 2d 1 (1990).

John wasn't convincing anyone—she just made it up—the hostility the reader had detected would suddenly seem certain.

v.    And then, if the reader went on to discover not only was the claim false, but Julia *knew* it was false and made it anyway, the reader would conclude—correctly—that Julia had acted with actual malice toward John.

vi.    Thenceforth, anything Julia said about John would be in light of the actual malice observed. With Julia's state of mind established the reader would have a truer understanding of the meaning, context, and intent behind Julia's sentence, *"John claimed he invited Bob to the party, but he wasn't convincing anyone."* and, by analogy, Defendant's state of mind can be deduced to establish the actual malice Defendant bears toward Plaintiff. [53] [i]

79.    The first clause in Defendant's statement, *"Nelsen claimed the club is open to all races,"* is true in the sense Plaintiff's claim is true. Defendant uses the present tense "is" so Plaintiff is making a claim about an imaginary club only in the planning stages, the plans for which clearly called for being open to men in distress from any race. As Defendant notes, "*In a letter sent to a Lexington resident in September of 2017, however, Nelsen claimed, 'While the program will address the particular challenges faced by white men, we will accept males of any race with a heroin addiction who are seeking help.'"* It is the credibility of that claim that Defendant seeks to undermine with the second clause so as to leave the reader believing Plaintiff is lying and is opening a whites-only club.

80.    The second clause, *"but he isn't convincing anyone."* was false and Defendant knew it was false as can be shown from the article itself. It is clear Defendant was familiar with the

_____

53 Here is a side-by-side comparison between Defendant's statement and an analogous
    http://robinsonjeffersboxingclub.com/library/splc/actual_malice_comparison.php

Facebook group, Lexington Bulletin Board, by the last sentence in the article: *The meeting drew a large crowd, but in the week since, Nelsen has only resorted to getting in virtual boxing matches with residents and his grand plan for Lexington remains, at least for now, between rounds*. Defendant could only make the statement if it was monitoring the Facebook group. Among those participating in the Facebook discussion were those who counseled a more moderate position, who had read the website, recognized the potential for good and the undeniable need for something to be done, and who pointed out that the RJBC was open to men of any race. In other words, they were "convinced" by Plaintiff. Therefore, Defendant knew that its claim that Plaintiff wasn't convincing anyone was false.

81. The defamatory statement was read by the public, causing damage to Plaintiff's reputation, and continues to cause damage.

82. The actions of Defendant, as set forth above, were outrageous because of Defendant's evil motive or reckless indifference to the rights of others, including Plaintiff herein, or in the alternative showed complete indifference to or conscious disregard for the rights of others, such as Plaintiff herein, or Defendant knew or had information from which Defendant, in the exercise of ordinary care, should have known that their conduct created a high degree of probability of harm to Plaintiff, and Defendant thereby showed complete indifference to or conscious disregard for the rights of others, such as Plaintiff herein, thereby justifying an award of punitive damages against Defendant in an amount sufficient to punish Defendant and to deter Defendant and others from like conduct.

83. As a direct and proximate result of the actions of Defendant described herein, Plaintiff sustained and will in the future continue to sustain, the following injuries and damages (the exact amount

of which is unknown at this time): humiliation, public contempt, ridicule, aversion, disgrace, emotional distress and anxiety, loss and damage to his reputation (both personally and professionally), physical injury and emotional distress which is medically diagnosable and medically significant, a loss of his enjoyment of life, a loss of income which will continue into the future, his earning ability has been permanently impaired, and an evil opinion of him has been induced in the minds of right-thinking persons, and deprived him of their friendly intercourse in society.

# <u>COUNT II</u>

**Defamation by implication. Defendant falsely implied Plaintiff was opening a whites-only club.**

84.     Comes now Plaintiff, and each of them, jointly and severally, and for Count II of this petition for damages against Defendant, and each of them, jointly and severally, and alleges and states as follows

85.     Plaintiff incorporates herein by reference each and every statement of the "Statements of Facts" as though fully set forth herein.

86.     Defendant was at fault in publishing the defamatory January 24, 2018 article, "**Anti-immigrant activist Craig Nelsen resurfaces In Missouri, attempting to start boxing club for opioid addicts**", or, in the alternative, published the article and all statements cited herein knowing they were false or with reckless disregard for whether they were true or false at a time when Defendant had serious doubt as to whether they were true:

87.     Defendant included the following passage in its January 24. 2018 Hatewatch article,

*Though Nelsen is not a neo-Nazi, he is certainly sympathetic to the white*

*nationalist cause. In a letter he sent to residents announcing his scheme,*

*Nelsen wrote, "I believe the devastation among white males is the*

*predictable result of decades of white male bashing in popular culture.*

*By the time a white male graduates from college, he has been subjected*

*to assaults on his dignity, his manhood, his history, and his culture."*

*Later in the letter, Nelsen claimed the club is open to all races, but he*

*isn't convincing anyone. Articles on the archived ProjectUSA website by*

*Nelsen include subjects such as "The White Minority."[54]*

88.  Defamation by implication can occur where "[a] combination of individual statements which in

themselves may not be defamatory might lead the reader to draw an inference that is damaging

to Plaintiff".[55] Defamation by implication is premised not on direct statements but on false

suggestions, impressions and implications arising from otherwise truthful statements.[56]

89.  No reasonable person could honestly deny the damage inflicted by Defendant's statement when

taken as a whole and "the court must give the disputed language a fair reading in the context of

the publication as a whole."[57]

90.  A reader walks away from the passage above with the false belief that Plaintiff is attempting to

---

54  This is typical sleight-of-tongue from the Defendant. The *subject* (the white minority) is written with title-style
    capitalization to mislead the reader into thinking Nelsen wrote an article *titled* "The White Minority". Nelsen wrote no
    such article. He did write an article, however, titled "Immigration and the pending white minority"
    [https://www.ocala.com/article/LK/20080824/Opinion/604241323/OS/] which discusses the impact of public policy on
    the nation's demographics. The SPLC would find it more to its goal of character assassination, clearly, if the reader was
    left with the false impression that Nelsen had written an article focused only on race, rather than a civic-minded and
    responsible article about the impact of a public policy.
55  Herbert v. Lando, 781 F.2d 298, 307 (2d Cir. 1986)
56  Armstrong v. Simon & Schuster, 85 N.Y.2d at 380–381, 625 N.Y.S.2d 477, 649 N.E.2d 825
57  Armstrong v. Simon & Schuster, Inc., 85 N.Y.2d 373, 380 (1995)

start a whites-only treatment center in Lexington. Using false equivalence, non sequitur, and a fraudulent appeal to the authority of the majority—the tools of the propagandist—Defendant, after publishing a quote from a local resident comparing Plaintiff's arrival in Lexington to start the Robinson Jeffers Boxing Club to a neo-Nazi's arrival in North Dakota to found a whites-only colony (thus linking in the minds of readers "neo-Nazi" and "whites only"), began with the clause

a) "Though Nelsen is not a neo-Nazi", which establishes the Defendant as the honest meta observer while simultaneously qualifying the disclaimer, Nelsen is not a neo-Nazi.

b) Defendant then draws two false equivalencies

    i.   between being a neo-Nazi and having sympathy for white nationalist ideals and

    ii.  between having sympathy for white nationalist ideals and noticing anti-white bigotry in the popular culture.

    Together the two back-to-back false equivalencies produce a third false equivalency

    iii. between noticing anti-white bigotry and being a neo-Nazi.

c) Next, after noting that Plaintiff "claims" the club will be open to men of any race, Defendant appeals to the authority of the majority[58] to refute Plaintiff with the false statement of fact: "he isn't convincing anyone", i.e., everyone believes Plaintiff intends the

_____

58 The public, therefore, among a democratic people, has a singular power, which aristocratic nations cannot conceive; for it does not persuade others to its beliefs, but it imposes them and makes them permeate the thinking of everyone by a sort of enormous pressure of the mind of all upon the individual intelligence. De Tocqueville, *Democracy in America*

Case 4:18-cv-00895-RK   Document 6   Filed 11/27/18   Page 40 of 62

club to be whites-only.[59] Defendant is savvy enough to know that public opinion bears all before it in America[60] and it is "very difficult to believe what the masses reject and to profess what they condemn."**[61]**

d) In the fourth sentence, Defendant provides the evidence, but not the evidence by which the *reader* can determine whether Plaintiff's club is whites-only. Rather, Defendant provides the evidence by which the *majority* determined whether Plaintiff's club is whites-only. Thus the reader is relieved of the effort and risk of making a determination as to the truth or falsity of the question, and so cares little whether the proof actually has any relation to the question it is alleged to have answered. The proof here offered is the *insinuated title* of a ten-year-old article Plaintiff wrote for a newspaper in Florida. Defendant didn't cite anything in the article that would justify using it as proof that Plaintiff would lie a decade later about whether the club he was opening would be open to non-whites, and that's because there was nothing in the article that lent itself to that end. So, Defendant simply insinuated a title[62] as proof and left it at that. Defendant is well-aware it could have offered a cookie recipe as proof and the typical reader would be willing to accept "whatever the majority accepted" without looking further.

91. The typical reader will come away from reading this paragraph with the false impression that Plaintiff is a neo-Nazi or white supremacist who intends to open a whites-only club on Main St in Lexington, Missouri and numerous references to Plaintiff in Facebook postings bear this out.[ii]

_____

59  Similarly to the argument in Count I.
60  There is a reason rival political campaigns battle over who is leading in the polls. Being in the lead makes a candidate more attractive to voters.
61  DeTocqueville, *Democracy in America*
62  The actual title of the article was "Immigration and the pending white minority" which Defendant changed to "The White Minority" in the January 24, 2018 article. https://www.ocala.com/opinion/20080824/immigration-and-the-pending-white-minority

Case 4:18-cv-00895-RK   Document 6   Filed 11/27/18   Page 41 of 62

92.    The statement cited herein as published by Defendant was false. Furthermore, the statement was read by the public causing damage to Plaintiff's reputation and continues to cause damage.

93.    The actions of Defendant, as set forth above, were outrageous because of Defendant's evil motive or reckless indifference to the rights of others, including Plaintiff herein, or in the alternative showed complete indifference to or conscious disregard for the rights of others, such as Plaintiff herein, or Defendant knew or had information from which Defendant, in the exercise of ordinary care, should have known that their conduct created a high degree of probability of harm to Plaintiff, and Defendant thereby showed complete indifference to or conscious disregard for the rights of others, such as Plaintiff herein, thereby justifying an award of punitive damages against Defendant in an amount sufficient to punish Defendant and to deter Defendant and others from like conduct.

94.    As a direct and proximate result of the actions of Defendant described herein, Plaintiff sustained and will in the future continue to sustain, the following injuries and damages (the exact amount of which is unknown at this time): humiliation, public contempt, ridicule, aversion, disgrace, emotional distress and anxiety, loss and damage to his reputation (both personally and professionally), physical injury and emotional distress which is medically diagnosable and medically significant, a loss of his enjoyment of life, a loss of income which will continue into the future, his earning ability has been permanently impaired, and an evil opinion of him has been induced in the minds of right-thinking persons, and deprived him of their friendly intercourse in society.

# <u>COUNT III</u>

**Defamation by endorsement. Defendant endorsed the false view of Plaintiff as resembling a neo-Nazi attempting to start a whites-only colony in North Dakota.**

95.     Comes now Plaintiff, and each of them, jointly and severally, and for Count III of this petition

for damages against Defendant, and each of them, jointly and severally, and alleges and states

as follows

96.     Plaintiff incorporates herein by reference each and every statement of the "Statements of Facts"

as though fully set forth herein.

97.     Defendant was at fault in publishing the defamatory January 24, 2018 article, "**Anti-immigrant**

**activist Craig Nelsen resurfaces In Missouri, attempting to start boxing club for opioid**

**addicts**", or, in the alternative, published the article and all statements cited herein knowing

they were false or with reckless disregard for whether they were true or false at a time when

Defendant had serious doubt as to whether they were true:

98.     In Defendant's January 24, 2018 article there was the following:

> *A number of Lexington's 4,000 residents are not happy at the prospect of Nelsen relocating to*
>
> *their town and setting up this club. One resident compared Nelsen's arrival in Lexington to that*
>
> *of neo-Nazi Craig Cobb, who attempted to start a whites-only colony in the tiny town of Leith,*
>
> *North Dakota, in 2012.*

99.     Citing a Lexington resident who compares Plaintiff to a neo-Nazi who moved to North Dakota

is not only guilt by association, it's guilt by association even where there is no association—a

contemptible enough smear tactic in itself and affirmative evidence Defendant intended the

defamatory inference that Plaintiff is a neo-Nazi. Defendant's attempt to inoculate itself against legal action by inserting a renunciation of the view it just got done publishing fails because, beginning the next paragraph, the renunciation is expressed in a concessive adjunct "Though Nelsen is not a neo-Nazi...", which is subordinate to the main clause of the sentence, "he is certainly sympathetic to the white nationalist cause." Defendant's renunciation, therefore, is far from unequivocal leaving open the possibility Defendant intended the defamatory inference that Nelsen is a neo-Nazi.

100.    The possibility of Defendant's intent becomes certain with affirmative evidence suggesting Defendant endorses the defamatory inference that can be taken from the Lexington resident's quote comparing Plaintiff to a neo-Nazi attempting to start a whites-only colony in North Dakota.[63] Elsewhere in the article, Defendant accuses Plaintiff of having a "fixation on high IQ" then ties the "fixation" to actual Nazis, and even Nazi atrocities. "*In fact, in 2002, his anti-immigrant group ProjectUSA received $10,000 in funding from the Pioneer Fund, a group started in 1937 to pursue "race betterment." For decades, it funded studies of race and intelligence, as well as eugenics, the "science" of breeding superior human beings that was discredited by various Nazi atrocities.*" That outlandish rhetoric is the additional affirmative evidence needed to satisfy the claim Defendant endorses the defamatory inference embedded in the Lexington resident's quote comparing Plaintiff to a neo-Nazi attempting to start a whites-only colony in North Dakota.

101.    The article is therefore a published endorsement of the view that Plaintiff is a neo-Nazi trying to start a whites-only club in Lexington. While the epithet "neo-Nazi" is so injudiciously tossed

---

63 "[I]f a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that Defendant intends or endorses the defamatory inference, the communication will be deemed capable of bearing that meaning" White v. Fraternal Order of Police, 909 F.2d 512, 520 [D.C.Cir.1990];see Janklow v. Newsweek, Inc., 759 F.2d 644, 648–649 [8th Cir.1985], cert. denied 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed. 2d 249 [1986]

about in modern America it resists any true-or-false assessment (half the country routinely calls President Trump a Nazi), the charge that Plaintiff was attempting to start a whites-only club is a statement of fact the truth or falseness of which can certainly be assessed. The statement is false and injurious to Plaintiff and therefore Defendant endorsed the defamatory statement.

102. Defendant's defamatory statement has caused an evil opinion of Plaintiff to be formed in the public mind as was made amply clear subsequently from the comments both on line and on the street.

103. Not only is the statement false, Defendant knew it was false as is made clear by Defendant's demonstrated familiarity with the Facebook group's postings, where there were examples of those who were convinced that the RJBC would be open to men of any race.

104. The statement cited herein as published by Defendant was false. Furthermore, the article was read by the public and Plaintiff's reputation has been damaged (Plaintiff has literally been called a Nazi on the street by complete strangers) and continues to be damaged.

105. The actions of Defendant as set forth above, were outrageous because of Defendant's evil motive or reckless indifference to the rights of others, including Plaintiff herein, or in the alternative showed complete indifference to or conscious disregard for the rights of others, such as Plaintiff herein, or Defendant knew or had information from which Defendant, in the exercise of ordinary care, should have known that their conduct created a high degree of probability of harm to Plaintiff, and Defendant thereby showed complete indifference to or conscious disregard for the rights of others, such as Plaintiff herein, thereby justifying an award of punitive damages against Defendant in an amount sufficient to punish Defendant and to deter

Defendant and others from like conduct.

106.    As a direct and proximate result of the actions of Defendant described herein, Plaintiff sustained and will in the future continue to sustain, the following injuries and damages (the exact amount of which is unknown at this time): humiliation, public contempt, ridicule, aversion, disgrace, emotional distress and anxiety, loss and damage to his reputation (both personally and professionally), physical injury and emotional distress which is medically diagnosable and medically significant, a loss of his enjoyment of life, a loss of income which will continue into the future, his earning ability has been permanently impaired, and an evil opinion of him has been induced in the minds of right-thinking persons, and deprived him of their friendly intercourse in society.

## <u>COUNT IV</u>

**Defamation. Defendant falsely stated Plaintiff is 'anti-immigrant'.**

107.    Comes now Plaintiff, and each of them, jointly and severally, and for Count IV of this petition for damages against Defendant, and each of them, jointly and severally, and alleges and states as follows

108.    Plaintiff incorporates herein by reference each and every statement of the "Statements of Facts" as though fully set forth herein.

109.    Defendant was at fault in publishing the defamatory January 24, 2018 article, "**Anti-immigrant activist Craig Nelsen resurfaces In Missouri, attempting to start boxing club for opioid addicts**", or, in the alternative, published the article and all statements cited herein knowing they were false or with reckless disregard for whether they were true or false at a time when

Defendant had serious doubt as to whether they were true:

110. Defendant, as a long-time advocate for the civil right of foreigners to move to the United States, has a history of tagging any group or individual advocating against current levels of mass immigration as "anti-immigrant". The characterization of Plaintiff as "anti-immigrant" is a false statement of fact in the same way a characterization of Jenny Craig as "anti-food" would be a false statement of fact.

111. Plaintiff Nelsen 's responsible immigration group, ProjectUSA, advocated for an immigration time-out to give the "assimilation magic a chance to work". Congress could enact a time-out tomorrow because immigration is just a government policy, but immigration zealots and profiteers have made immigration into a sort of religious imperative. Where once we spoke of America's pioneering spirit, we now think of ourselves as a nation of immigrants. But immigration as a founding myth differs from the actual history of immigration to the United States, which always included periodic time-outs in between waves of immigration. Time-outs have always been a component of the American immigration success story and there is no reason to suppose they shouldn't continue to be. The most recent time-out lasted from 1925 to 1965 during which time the country built a huge and stable middle class, built the largest economy the world had ever seen, built the space program that was about to land a man on the moon, invented computers, extended civil rights to all Americans, built the interstate highway system, achieved full literacy, had the highest life expectancy in the world, had the highest standard of living in the world, fought and won a world war against two super powers simultaneously, and turned the last great wave of immigrants into Americans. That is to say, the legislation of the 1920s that implemented the last time-out was pro-immigrant in that it made a

nation of immigrants into a nation of Americans by remaining true to the traditional US
immigration patterns.

112.     Organizations like the Southern Poverty Law Center label those who advocate for remaining
true to the traditional immigration pattern as hate groups and extremists and stealth Nazis. And
even though this is the language of the zealot, it plays a very large role in maintaining our
current wave, which has now extended more than half a century—far beyond, in terms of sheer
numbers and length of time, any previous wave—and there isn't even the whisper of a time-out
on the horizon. In Plaintiff's view, having arbitrarily eliminated without discussion the time-out
component of our immigration tradition, Congress has set the nation on a problematic, even
dangerous course—a reckless and irreversible blind plunge forward, unprecedented in human
history, the consequences of which are completely unpredictable. Current policy, therefore, is
both anti-American and anti-immigrant.

113.     Plaintiff's concerns about immigration are reasonable. It should be clear that it is possible to
have such concerns about current immigration policy without needing to be driven by hatred of
the immigrants themselves. But Defendant attacks anyone who criticizes current policy—
savaging anyone who suggests a time-out or any reduction at all in either legal or illegal
immigration as anti-immigrant and a "hate group". These unwarranted attacks are a primary
impediment to common sense policy changes.

114.     Defendant uses the term "anti-immigrant" against Plaintiff Nelsen four times in the January 24
article to ensure the negative connotation of "hate" Plaintiff Nelsen bears towards individual
immigrants isn't missed by the reader. But while Defendant makes liberal use of the term "anti-
immigrant" to aid in Defendant's overall goal of casting Plaintiff Nelsen as a loathsome and

hate-filled person, Defendant would be unable to produce a single example of Plaintiff Nelsen being actually anti-immigrant. Indeed, the extreme opposite is the case. Plaintiff Nelsen, as co-owner of several San Loco restaurants in Manhattan in the 1980s and 1990s employed many immigrants, both legal and illegal. Some of the immigrant workers were with Plaintiff Nelsen from the first day the business opened during a February blizzard in1986 at 129 Second Ave in New York City until Plaintiff Nelsen sold out his share of the businesses in 1999. Unlike many employers of immigrant labor, Plaintiff Nelsen paid his immigrant workers the same as his native-born workers and was rewarded with fierce loyalty. Unlike many employers of immigrant labor—or non-immigrant labor, for that matter—Plaintiff Nelsen was invited to, and attended, his immigrant workers' *fiestas de Navidad* in their homes in Queens. When the wife of one immigrant worker gave birth, the proud father took Plaintiff Nelsen up to see his new daughter at Beth Israel's maternity ward. Two brothers from the Oaxaca region of Mexico, who worked for Plaintiff Nelsen, when they learned Plaintiff Nelsen was planning a trip to their home region, entrusted Plaintiff Nelsen with suitcases full of toys and gifts and letters and money to deliver to their family back in Mexico. The village was so remote that Plaintiff Nelsen was the first white man to visit it, though a white woman, he was told, had visited in the 1950s. There was no actual road to the remote village, just an unmaintained track hugging the sheer sides of mountains. There was no telephone service there, either, and, while there was weekly mail service, the brothers didn't use it as it was unlikely any letter or package originating from the US would make it past unscrupulous postal workers. After a harrowing journey, Plaintiff Nelsen finally reached the brothers' home village, where a small crowd of villagers helped guide him to the Aragon residence. The family had no idea Plaintiff Nelsen was coming and the father was shocked at the sight of Plaintiff Nelsen at his door. Plaintiff Nelsen quickly opened

one of the suitcases and displayed the contents. As soon as the father realized they were from his two sons, from whom he hadn't heard in years, he closed the suitcases back up. Though he must have been dying to read the letters and explore the contents of the suitcases, hospitality to the stranger came first. He handed the suitcases to a young son, telling him to put them away. Then he invited Plaintiff Nelsen into his house to eat and drink. The mother made delicious hand-made tortillas with local spices in an open fire pit in the courtyard in front of the adobe house and they ate while Plaintiff Nelsen struggled to give them news in Spanish of Angel and Reynaldo "Ray" Aragon. The father didn't even know the two brothers were in New York City, or whether they were even alive. When it was time to go, the father attempted to give Plaintiff Nelsen a gift, which was a huge live turkey that had been strutting around the courtyard. Plaintiff Nelsen thanked him sincerely, but declined the gift explaining he was certain he would be unable to take it on the plane with him back to New York. The father then wept and made Plaintiff Nelsen promise him he would look out for his sons in New York City and be their protector. Plaintiff Nelsen promised, and meant it, and did. Defendant's charge that Plaintiff Nelsen is "anti-immigrant" is as contemptible as it is false.

115.    The statements cited herein as published by Defendant were false. Furthermore, the article was read by the public and Plaintiff's reputation has been damaged and continues to be damaged.

116.    The actions of Defendant, as set forth above, were outrageous because of Defendant's evil motive or reckless indifference to the rights of others, including Plaintiff herein, or in the alternative showed complete indifference to or conscious disregard for the rights of others, such as Plaintiff herein, or Defendant knew or had information from which Defendant, in the exercise of ordinary care, should have known that their conduct created a high degree of

probability of harm to Plaintiff, and Defendant thereby showed complete indifference to or conscious disregard for the rights of others, such as Plaintiff herein, thereby justifying an award of punitive damages against Defendant in an amount sufficient to punish Defendant and to deter Defendant and others from like conduct.

117.   As a direct and proximate result of the actions of Defendant described herein, Plaintiff sustained and will in the future continue to sustain, the following injuries and damages (the exact amount of which is unknown at this time): humiliation, public contempt, ridicule, aversion, disgrace, emotional distress and anxiety, loss and damage to his reputation (both personally and professionally), physical injury and emotional distress which is medically diagnosable and medically significant, a loss of his enjoyment of life, a loss of income which will continue into the future, his earning ability has been permanently impaired, and an evil opinion of him has been induced in the minds of right-thinking persons, and deprived him of their friendly intercourse in society.

# <u>COUNT V</u>

**Defamation. Defendant falsely claims Plaintiff Nelsen's organization put up racist billboards**

118.   Comes now Plaintiff, and each of them, jointly and severally, and for Count V of this petition for damages against Defendant, and each of them, jointly and severally, and alleges and states as follows

119.   Plaintiff incorporates herein by reference each and every statement of the "Statements of Facts" as though fully set forth herein.

120.   Defendant was at fault in publishing the defamatory January 24, 2018 article, "**Anti-immigrant**

**activist Craig Nelsen resurfaces In Missouri, attempting to start boxing club for opioid addicts**", or, in the alternative, published the article and all statements cited herein knowing they were false or with reckless disregard for whether they were true or false at a time when Defendant had serious doubt as to whether they were true:

121.    Defendant writes, "*[Nelsen's] group made a name for itself by sponsoring racist billboards. One on display in New York City depicted a white boy and the words, 'Immigration is doubling U.S. population in my lifetime.*'" The billboards in question advertised a verifiable statistic from the US Census Bureau and featured pictures of both white and non-white children. The fact that Defendant tries to paint the false picture that only white children were pictured shows Defendant is interested in defaming, not informing.

122.    Charging a person with being racist constitutes mere name calling because it does not contain a provably false assertion of fact as is required to state a claim for defamation.[64] However, charging a person with having membership in a racist organization like the Ku Klux Klan, for example, *is* actionable.[65] A false charge of membership in a racist organization is actionable because it bathes the person so charged in obloquy as a racist, which harms the reputation, and it contains an assertion of verifiable fact. It stands to reason that a false charge of running a racist organization—i.e., an organization that makes a name for itself erecting racist billboards —is actionable.

123.    It may be objected that calling a billboard racist is no more actionable than calling a person racist because the slur "racist" contains no provably false assertion of fact and is therefore only

---

64  Overhill Farms, Inc. V. Lopez, 190 Cal.App.4th 1248, 1262 (4 Dist. 2010)
65  FORTE v. JONES, United States District Court, E.D. California, March 19, 2013.

name-calling, that is to say, opinion. From the First Amendment, absolute privilege is "accorded statements of opinion, which even if made maliciously or insincerely, do not give rise to a libel cause of action."[66] Missouri recognizes one exception to this general rule. The privilege does not apply when the statement of opinion implies the existence of undisclosed defamatory facts.[67] Defendant seeks to raise the term "racist" above mere vituperative opinion by alleging a factual justification for the charge the billboards were racist: "*sponsoring racist billboards. One on display in New York City depicted a white boy"*. An ordinary reader would assume the writer was basing the statement on the basis of facts known to him showing the billboards were racist and therefore the statement is capable of supporting a charge of defamation.[68]

124.     Leaving aside the question of whether including the image of a white boy on a billboard renders the billboard racist, the statement is false by omission and clearly an attempt to mislead. Defendant appears to justify calling the billboards racist by asserting a statement of fact: billboards show a white boy. But the statement is false, therefore the justification is fraudulent, and because Defendant *knew* or should have known the statement was false, Defendant acts with actual malice in asserting Plaintiff's organization made a name for itself putting up racist billboards.

---

66 Pape, 918 S.W.2d at 380
67  Nazeri, 860 S.W.2d at 311
68  Henry v. Halliburton, 690 S.W.2d 775, 788 (Mo. banc 1985); Diez v. Pearson, 834 S.W.2d 250, 252 (Mo.App. E.D.1992)



125.    Thousands of ordinary Americans contributed financial support to help ProjectUSA contract
        with a wide array of billboard companies for hundreds of billboards. These billboards appeared
        in Minnesota, California, Arizona, Utah, New York, New Jersey, South Carolina, North
        Carolina, Florida, Kansas, Michigan, Iowa, Colorado, and New Hampshire. Every board
        advertised important information about this important issue to Plaintiff's fellow citizens. In
        addition, Plaintiff was a frequent guest on radio programs from coast to coast, AM and FM,
        black radio, white radio, big stations and small, nationally syndicated and single-market outlets.
        He also appeared numerous times on Fox, CNN, CSPAN, and many local and network
        television news and public interest programs. He gave countless interviews to reporters writing
        for newspapers ranging from the Chariton High School student paper of Chariton, Iowa to the
        *New York Times*. He gave speeches to activist groups and civic groups across the country, was a
        featured speaker at the Florida Sheriffs Association's annual convention in Naples, Florida, and
        testified before Congress. The idea the billboards were "racist" is absurd and damaging and the
        attempt to justify the charge that Plaintiff Nelsen founded a racist organization using that false
        assertion of fact makes the statement defamatory.

126.    The statements cited herein as published by Defendant were false. Furthermore, the article was
        read by the public and Plaintiff's reputation has been damaged and continues to be damaged.

127.    The actions of Defendant, as set forth above, were outrageous because of Defendant's evil

motive or reckless indifference to the rights of others, including Plaintiff herein, or in the

alternative showed complete indifference to or conscious disregard for the rights of others, such

as Plaintiff herein, or Defendant knew or had information from which Defendant, in the

exercise of ordinary care, should have known that their conduct created a high degree of

probability of harm to Plaintiff, and Defendant thereby showed complete indifference to or

conscious disregard for the rights of others, such as Plaintiff herein, thereby justifying an award

of punitive damages against Defendant in an amount sufficient to punish Defendant and to deter

Defendant and others from like conduct.

128.    As a direct and proximate result of the actions of Defendant described herein, Plaintiff sustained

and will in the future continue to sustain, the following injuries and damages (the exact amount

of which is unknown at this time): humiliation, public contempt, ridicule, aversion, disgrace,

emotional distress and anxiety, loss and damage to his reputation (both personally and

professionally), physical injury and emotional distress which is medically diagnosable and

medically significant, a loss of his enjoyment of life, a loss of income which will continue into

the future, his earning ability has been permanently impaired, and an evil opinion of him has

been induced in the minds of right-thinking persons, and deprived him of their friendly

intercourse in society.

# <u>COUNT VI</u>

**Malicious intent. Defendant unjustly defamed Plaintiff with the intent to completely destroy his effort.**

129.    Comes now Plaintiff, and each of them, jointly and severally, and for Count VI of this petition

for damages against Defendant, and each of them, jointly and severally, and alleges and states as follows

130. Plaintiff incorporates herein by reference each and every statement of the "Statements of Facts" as though fully set forth herein.

131. Defendant was at fault in publishing the defamatory January 24, 2018 article, "**Anti-immigrant activist Craig Nelsen resurfaces In Missouri, attempting to start boxing club for opioid addicts**", or, in the alternative, published the article and all statements cited herein knowing they were false or with reckless disregard for whether they were true or false at a time when Defendant had serious doubt as to whether they were true:

132. In the January 24, 2018 article Defendant writes that "Nelsen...is attempting to start a 'boxing club' for 'high IQ white male heroin addicts'", neglecting to mention the other races. Defendant then uses the word "however" to signify contradiction to the truth, then has Plaintiff "claim" the true thing that would exonerate him of the charge of racial discrimination. To the typical reader, Plaintiff is just lying and the club is really only for white males as Defendant asserted as a fact independently verified.

133. Defendant writes, "Nelsen's fixation on high IQ is an age-old white nationalist trope." First, Plaintiff was not "fixated" on high IQ. Plaintiff made no mention of IQ on the RJBC website except as it pertains to the aspect of addiction that is cognition-dependent. It is Defendant that seems fixated on the high-IQ component of the program, bringing it up three times in the article, while explicitly invoking Nazism.

134. Defendant writes, *"In fact, in 2002, his anti-immigrant group ProjectUSA received $10,000 in funding from the Pioneer Fund, a group started in 1937 to pursue 'race betterment.'"* 1937? Race betterment? The immediate association, of course, is Nazi Germany. (This is a rehash of the original SPLC attack on Nelsen in 2002.)

135. In 1937, there were lots of groups, e.g., Planned Parenthood, interested in "race betterment". So what?

136. Plaintiff used to live across the street from a synagogue on the Upper East Side, and the week's sermon would frequently be on subjects, e.g., mixed marriages, as they pertained to the betterment of the Jewish people. So what?

137. While Plaintiff was living in China, they relaxed the one-child policy on the grounds that it was lowering the collective IQ of the Chinese because the low-IQ peasants were the only ones having more than one child. So what?

138. The truth is, outfits like the SPLC have used the Nazi atrocities to discredit any white person who shows the same concern for the well-being of his own people as Jews show for Jews, or Chinese show for Chinese.

139. The SPLC has never once condemned the synagogue on E 79th St for pursuing race betterment for Jews. But they will reach back to 2002 to find a single donation from a single foundation and then reach back two generations to the foundation's beginnings in 1937 and the views of a single board member interested in race betterment—whose views would not look out of place today in a synagogue on E 79th St—and use that as evidence in 2018 to smear Plaintiff as a

white nationalist, racist Nazi.

140.    Here's the honest truth: Plaintiff happens to be a high-IQ white male former heroin addict. There is currently a national crisis involving high-IQ white male heroin addicts. Not surprisingly, Plaintiff recognizes them, empathizes with them, and understands them because he is one of them. He feels motivated to help them because he recognizes them, empathizes with them, and understands them. He is acting, in other words, like a normal, healthy, well-socialized, compassionate, civic-minded human being. But Defendant implies and endorses the view this attempt to relieve the suffering of men in distress makes him a neo-Nazi. Despite Plaintiff recognizing there are those of other races also suffering, and explicitly stating on his website and elsewhere that the program is open to men of any race, Defendant makes readers falsely believe, in an article written to be as destructive as possible, that Plaintiff, motivated by racism and hatred of non-whites, is opening a whites-only club. The indifference to the truth about RJBC, and the willingness to engage in such scorched-earth vitriol against RJBC, confirms SPLC Senior Fellow Mark Potok's assertion that the goal of Defendant is to "completely destroy". By this, the malicious intent to derail the RJBC unjustly through a defamatory attack is shown.

141.    The actions of Defendant, as set forth above, were outrageous because of Defendant's evil motive or reckless indifference to the rights of others, including Plaintiff herein, or in the alternative showed complete indifference to or conscious disregard for the rights of others, such as Plaintiff herein, or Defendant knew or had information from which Defendant, in the exercise of ordinary care, should have known that their conduct created a high degree of probability of harm to Plaintiff, and Defendant thereby showed complete indifference to or

conscious disregard for the rights of others, such as Plaintiff herein, thereby justifying an award of punitive damages against Defendant in an amount sufficient to punish Defendant and to deter Defendant and others from like conduct.

142.    As a direct and proximate result of the actions of Defendant described herein, Plaintiff sustained and will in the future continue to sustain, the following injuries and damages (the exact amount of which is unknown at this time): humiliation, public contempt, ridicule, aversion, disgrace, emotional distress and anxiety, loss and damage to his reputation (both personally and professionally), physical injury and emotional distress which is medically diagnosable and medically significant, a loss of his enjoyment of life, a loss of income which will continue into the future, his earning ability has been permanently impaired, and an evil opinion of him has been induced in the minds of right-thinking persons, and deprived him of their friendly intercourse in society.

## **DEMAND**

143.    Missouri courts require a showing of actual damages in all defamation cases.[69] To demonstrate actual damages, plaintiffs must show that defamatory statements caused a quantifiable professional or personal injury, such as interference with job performance, psychological or emotional distress, or depression.[70] Actual damages include loss of savings ($15,000), loss of future earnings ($640,000), and loss of future value ($4,100,000). Plaintiff seeks $4,755,000 in actual damages.

144.    In Missouri, a defamation claim must include proof of harm to the plaintiff's reputation,[71] and

69  Bauer v. Ribaudo, 926 S.W.2d 38 (Mo.App. E.D.1996)  Nazeri v. Missouri Valley College, 860 S.W.2d at 313.
70  Arthaud v. Mutual of Omaha Ins. Co., 170 F.3d 860, (8th Cir.1999) (applying Missouri law)
71  Kenney v. Wal-Mart Stores, Inc. 100 S.W.3d 809 (2003)

while the 8th Circuit has relied upon *Hogue v. Ameron Inc.* for the principle that a plaintiff's testimony that her reputation has been injured can be sufficient evidence of harm,[72] (and Plaintiff so attests), the Facebook postings alone give ample evidence of such harm. The The 8th Circuit has also relied upon *Little Rock Newspapers, Inc*. for the concept that harm to a plaintiff's reputation can be demonstrated by evidence that others think less of Plaintiff because of the defamatory statements.[73] Such harm is abundantly demonstrated as, for example, in ¶¶57, 58, 60, 61, 62, 63, 68, and 73 above.

145.   Plaintiff is not a public figure within the meaning applicable to defamation cases,[74] and is therefore not required by the First Amendment to meet the "actual malice" standard[75] in order to recover from Defendant.[76]  While a showing of negligence is a sufficient degree of fault to support a defamation action and recovery of damages for a private citizen such as Plaintiff, an award of punitive damages is available to the court upon a showing of "actual malice"[77] which has been shown herein.

146.   WHEREFORE, Plaintiff prays for actual damages against Defendant, and each of them, jointly and severally, in an amount of $4,755,000 and punitive damages against Defendant, and each of them, jointly and severally, statutory and other interest, his costs and for such other and further relief as the Court deems just and proper.

---

72  286 Ark. 481, 695 S.W.2d 373, 374 (1985)
73  954 S.W.2d at 920-21
74  Dun & Bradstreet v. Greenmoss Builders, Inc., 472 U.S. 749 (1985)
75  New York Times Co. v. Sullivan, 376 U. S. 254
76  Wolston v. Reader's Digest Assn., Inc., 443 U.S. 157 (1979)
77  Gertz V. Robert Welch, Inc., (1974) No. 72-617

# CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 11/26/2018

Signature of Plaintiff

Printed Name of Plaintiff CRAIG NELSON

i    Actual malice side-by-side comparison
ii   Anatomy of a smear