# Exhibit B-2

                IN THE UNITED STATES DISTRICT COURT

              FOR THE WESTERN DISTRICT OF MISSOURI

                       WESTERN DIVISION


CRAIG NELSEN,                         )
                                      )
                       Plaintiff,     )
                                      )
             -vs-                     ) No. 4:18-cv-00895-RK
                                      )
SOUTHERN POVERTY LAW CENTER,          )
                                      )
                       Defendant.     )


             Zoom deposition of STEPHEN PIGGOTT,
taken before KAREN KOSTAS, CSR, RMR, CRR, RDR
and Notary Public, pursuant to the Federal Rules
of Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
at 1909 K Street, NW, 12th Floor, Washington, D.C.,
at 9:30 a.m. on the 25th day of September, 2020.

Case 4:18-cv-00895-RK   Document 132-2   Filed 11/13/20   Page 2 of 19

A     No.  Just -- Just, you know, in general.  You know, it doesn't -- it doesn't have to be following something that we write or the SPLC writes.  I think a lot of people, you know, turn to different things throughout their professional career.

Q     Right.  And so I'm trying to think of an example of just the normal.  Like say there's a university professor and -- and in the year 2000 he or she makes, you know, has -- has potential for some research project that he or she does and then doesn't do anything again until maybe 20 years later and then has another research project that gains some attention.  Would we say that Professor So and So popped back up?

A     I -- I think it's fine to say that.

Q     Okay.  All right.  Next she assumes you're handling it.

Was it your typical job to -- to handle -- What was it about this that made her assume you were handling it?

A     Handling in this context is when a tip comes in, the tips go to the people who

are assigned to the different ideologies and the -- the response was to handle, making sure, you know, taking a look at the -- the e-mails that came in and -- and -- and making a decision about whether it's, you know, something to write about or something else.

Q   All right.  And which ideologies were you assigned?

A   That -- That I was looking at?

Q   Yes.

A   I managed a team that monitored the anti-Muslim and anti-immigrant groups.

Q   Okay.  All right.  Well, okay, can you explain how the Robinson Jeffers Boxing Club fell into your lap?

THE REPORTER:  What was the name of the club?  Excuse me, Counsel.  Can you explain how the, what was the name of the boxing club?

MR. NELSEN:  Robinson Jeffers Boxing Club.

THE REPORTER:  Robinson Jeffreys?

MR. NELSEN:  Yeah.  Robinson Jeffers.

THE REPORTER:  Jeffers.  Okay.
Thank you.

If you could speak up, because you're very soft and he's very loud, and I can't control it on my end because then I can't hear -- I can't hear you.  Sorry.
Go ahead.

MR. NELSEN:  Okay.

THE REPORTER:  Can you explain how the Robinson Jefferson -- Jeffers Boxing Club, what was the end, came about?

MR. NELSEN:  Yeah.  Fell into his lap, into Stephen's lap.

A    It -- It fell into my hands based on your prior work with Project USA.

BY MR. NELSEN:

Q    Okay.  And you were familiar with my -- my prior work before?

A    Yes.

Q    Okay.  Was that due to the colorful nature of my activism and -- Go ahead.

A    I had been -- I had been covering, you know, the anti-immigration groups in the country with various organizations since, I

believe, 2009.  So I was aware of your work with Project USA before the boxing club.

Q    Okay.  Yeah.  2009, I think I pretty much folded up my -- my table and went home.

All right.  You're aware that we object to the term anti-immigration?

A    Am I aware that you reject that term?

Q    Yeah.  Those of us who agree with me object to that term, right.

A    I'm -- I'm aware of that.  Yes, I'm aware of that.

Q    Okay.  Thanks.

(Piggott Exhibit 3 marked.)

BY MR. NELSEN:

Q    All right.  Let's go on to No. 3.

And somebody named -- Who is Alex Amend?

A    Alex Amend was my supervisor.  He was the, I believe, research director at the time.

Q    Okay.  And he answered to Heidi?

Q   You found it bizarre, strange, crazy.  Yeah.

And do you still believe that -- that the Robinson Jeffers Boxing Club was an effort for -- Are you not convinced that the Robinson Jeffers Boxing Club would have been open to any male in distress regardless of race?

A   You -- You said that and I believe I mentioned that in the blog that you said it was open to all -- all races.  But, you know, you know, a common trope of far right or white nationalists believe this belief in high IQ and that's an indicator to me that, again, you were, you know, directing this towards white males.

Q   Okay.  Had you read -- Well, I mean I was very up front about that.

A   Yes.

Q   Granted in our modern -- our modern society.

But you read through -- You had read through the Web site at this point, I'm assuming?

Case 4:18-cv-00895-RK   Document 132-2   Filed 11/13/20   Page 7 of 19

A   I don't know if I had read through the Web site when this -- when this e-mail was -- was sent.

Q   You already looked at my Twitter and my personal Web site?

A   I had looked at your Twitter and your personal Web site, yes.

Q   Okay.  So you might have -- you might have, before you wrote this e-mail, come to the part on the Web site where I mentioned that high IQ drug addicts are particularly -- well, high IQ males are particularly vulnerable to drug addiction and the programs designed to help addicts are particularly ineffective for that demographic.

Had you come across that yet?

A   I don't recall if I had come across that when I wrote this e-mail.

Q   Okay.  Eventually I'm -- I'm supposing you did, or didn't you?  Did you ever see that on the Web site?

A   I did -- I did read through the Web site, yes.

Q   Okay.  So were my arguments not

Can you restate what your view is of my assertion that the club would have been open to all races?

A    I was not convinced that it would be open to all races.

Q    Okay.  And -- But you're saying that -- that I'm -- You're denying that I'm not telling the truth unless -- Let's see.

I'm claiming the club will be open to all races, you're -- you are saying that I'm not accurate or I'm not telling the truth or I'm mistaken or I'll change my mind.  Can you say how it is that I'm not convincing you?  Why would you disbelieve me?

A    Based, again, on you're -- you're talking about a club for white males and, you know, the bulk of the things that you put out about the club were, again, about focusing on white males and high IQ.

You know, the quote -- the quote just directly above that:  I believe the devastation among white males is predictable -- is the predictable result of decades of white male bashing in popular culture.  By the

sentence, but then assume insincerity in the next sentence.  Why the difference?

A    Again, because the bulk of the writing that you put out about this boxing club is fixated on white males.

Q    All right.  And you just granted me the assumption of sincerity that in my view, and, in fact, statistics bear me out, white males who are 30 percent of the population and we account for 70 percent of the nation's suicides, isn't that -- isn't that just by itself a good example of devastation among this population?

A    I am not -- I'm not aware of those statistics.

Q    It's mentioned several times in the Robinson Jeffers Boxing Club Web site that you claim you read.  Did you skip that part, or?

A    I -- I don't recall seeing that.

MR. BOWMAN:  If you remember.

A    Yeah.

BY MR. NELSEN:

Q    Okay.  So okay.  All right.  Well, I'll just restate this to refresh your memory.

result of decades of white male bashing in popular culture and, you know, that white males have been subjected to assaults on dignity, manhood, history and culture, I don't agree with the premise of that.

Q    Okay.  And --

A    Those -- Those are -- I believe those are your -- your -- your conclusions to the, you know, the suicide rates and opioid use.

Q    Right.  We came to different conclusions.  I'll grant you that.

But I'm asking you whether there are certain conclusions that you can claim up front are unallowed, that they're just off the table, or if you do come to that conclusion you will be attacked by the SPLC as a white nationalist, racist.

A    Again, the -- the comments that you -- you made here, again, that white males are subjected to assaults on dignity, manhood and culture, are all, again, talking points that I see a lot when I look at the far right in the United States.  So talking about high

Case 4:18-cv-00895-RK   Document 132-2   Filed 11/13/20   Page 11 of 19

IQ and talking about, you know, that white males are victimized are -- are both two of the, you know, most common talking points that I see, you know, projected by far right groups and individuals in the United States.

Q    Right.  So what you're saying is before we even start to figure it out, just say, by the way, Craig, we can't come up with this conclusion because far right people come up with it, therefore, this conclusion is automatically wrong?

MR. BOWMAN:  Objection.

A    I believe it is wrong.

BY MR. NELSEN:

Q    Okay.  Correct.  And the reason is because other people who you don't approve of have come to this same conclusion, that makes it wrong, is that what makes it wrong?

A    What makes it wrong is that it's, again, it's problematic that these are, you know, these are common tropes, you know, pushed forward by, you know, --

Q    Bad people?

A    -- by people that, you know, that

A    I, again, disagree with the premise of your conclusion.

Q    Okay.  And the basis for your disagreement, just to establish this, is because you don't like some of the people who have come to the same conclusion?

MR. BOWMAN:  Objection, misstates testimony.

Answer, if you can.

A    Again, as -- as I said before, I disagree because, you know, the -- the -- the reasons that you've given are, again, extremely common reasons that I've seen white nationalist groups and individuals use for -- for -- for a long time.

BY MR. NELSEN:

Q    How do you know those groups are wrong in this case?  Those people who say that, how do you know they're wrong?

A    I don't understand how you -- what you mean by that.

Q    Well, you say that this is a viewpoint that's commonly expressed by white nationalist groups?

A   I think I've already answered that, Craig.

BY MR. NELSEN:

Q   Okay.  That's what I'm saying, I just don't remember what you said.  Can you tell me?

A   That I'm not convinced.

Q   Okay.  All right.  What -- What changed -- What was it that changed between the time you wrote the article and today that convinced you?

A   Nothing has changed.  I said, again, that your -- the fixation on white males and, you know, IQ and the assault on white males' dignity, manhood, history and culture all indicate to me that that's why.

Q   So you're not convinced then that it would be open -- You're still convinced -- You're not convinced that we would be open to males in distress of any race who came to us seeking help?

A   Again, based -- based on your -- based on what you have put out about this club, I was not convinced.

Q    If I -- If I recall correctly, one of the pieces that Heidi published 20 years ago used the exact phrase, discredited by various Nazi atrocities.

Did you just lift that from one of her articles?

A    I -- I definitely took pieces from, you know, articles that were written prior. I'm not sure if it was a piece written by Heidi.  It might have been.

Q    All right.  If -- Let's -- Let's, for the sake of argument, let's -- let's assume that you're right and that I was misleading the public when I said that our -- our club would be open to men in distress of any race.  Maybe I was just lying and pulling -- pulling one over on the public.  And when it came down to when we actually opened the doors, we would have turned away a black man in distress or -- or a Latino man in distress, and we would have only -- that -- that really secretly I really only wanted to help white -- high IQ white males.  What's wrong with that?

A    You're asking me what's wrong with

know, it's not uncommon for SPLC staff to write stories about people that they have written about in the past and they're now writing about their current activities.

Q Right. And what -- what purpose does it serve to make -- to make it harder for me to -- Why wouldn't the SPLC just say, oh, he's trying to help men in distress, let's not print this article which is clearly going to make it more difficult for him to help men in distress, why would they do that, what's their purpose, what's their goal?

MR. BOWMAN: Objection.

The witness can answer, if he knows.

A Again, I don't know what -- I don't know what the SPLC's purpose is. I mean I can speak for myself.

BY MR. NELSEN:

Q What was your purpose?

A One reason I wrote the article was, again, as I said, because you -- you were, you know, this was -- this was a new development for you.

And another reason is we, you know,

we received a number of these tips from -- from -- from people in the area who were -- were troubled by it.

And -- And -- And I, you know, I wrote this piece to -- to kind of -- I had seen as well, you know, the articles that had been written and just wanted to include some of your backstory and just kind of write a more, I don't know what the right word is, kind of robust piece, a piece about -- about this development.

Q    Are you aware that about two weeks before you published the January 24th article a resident in Lexington had circulated the earlier Heidi Beirich articles about me and posted them on Facebook?

A    I don't -- No, I'm not aware about that.  I remember seeing a Facebook -- a Facebook discussion about this, but I don't remember seeing Heidi's articles about -- that were posted.  I do remember seeing discussions in the community that were on Facebook about the -- the boxing club.

Q    Yeah.  It was the only topic in town

STATE OF ILLINOIS  )

                   )  ss:

   COUNTY OF COOK  )

The within and foregoing deposition of the aforementioned witness was taken before KAREN KOSTAS, CSR, RMR, CRR, RDR and Notary Public, at the place, date and time aforementioned.

There were present during the taking of the deposition the previously named counsel.

The said witness was first duly sworn and was then examined upon oral interrogatories; the questions and answers were taken down in shorthand by the undersigned, acting as stenographer and Notary Public; and the within and foregoing is a true, accurate and complete record of all of the questions asked of and answers made by the aforementioned witness, at the time and place hereinabove referred to.

Before completion of the deposition, review of transcript (x) was ( ) was not requested.  If requested, any changes made by the deponent and provided to the reporter during the period allowed are appended hereto.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature and seal as Notary Public in and for Cook County, Illinois, on  this 9th day of October, 2020.

_____

KAREN KOSTAS, CSR, RMR, CRR, RDR

CSR No. 084-001400

One North Franklin Street

Suite 3000

Chicago, Illinois 60606

312-442-9087