**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CRAIG NELSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-00895-CV-RK |
| | ) | |
| SOUTHERN POVERTY LAW CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Southern Poverty Law Center's motion for summary judgment. (Doc. 130.) The motion is fully briefed. (Docs. 131, 138, and 139.) For the reasons below, the Court **GRANTS** the motion for summary judgment.

## Background

This lawsuit stems from an article featuring Nelsen's attempt to start a boxing club in Lexington, Missouri, which was designed to be a drug treatment program for men (the "Club"). Nelsen described the Club on its website as "designed to address the specific challenges unique to white males in the United States" but was open to "men in distress of any race." (Doc. 6 at ¶ 44.) "[The Club] was also intended for high IQ men, partly because of the demanding academic component." (Doc. 6 at ¶ 46.) On January 24, 2018, the Southern Poverty Law Center ("SPLC") published an article featuring Nelsen and the Club on its "Hatewatch blog" (the "Article"). The Article is the subject of this defamation action.

Nelsen filed a five-count Complaint[1] in which he challenged the following statements and passages in the Article as defamatory:

- "Nelsen claimed the club is open to all races, but he isn't convincing anyone." (Count I)

- "Though Nelsen is not a neo-Nazi, he is certainly sympathetic to the white nationalist cause. In a letter he sent to residents announcing his scheme, Nelsen wrote, 'I believe the devastation among white males is the predictable result of decades of white male bashing

---

[1] When referring to the Complaint for purposes of this Order, the Court is referencing the Amended Complaint (Doc. 6), which is the operative complaint in that Nelsen filed it before serving the original complaint (Doc. 5). *See* Fed. R. Civ. P. 15(a)(1). Furthermore, the Court notes Nelsen subsequently filed another Amended Complaint (Doc. 20) without seeking leave of the Court and without the opposing party's written consent in violation of Fed. R. Civ. P. 15(a)(2). To the extent Doc. 20 was improvidently filed, it is hereby struck on that ground.

in popular culture. By the time a white male graduates from college, he has been subjected to assaults on his dignity, his manhood, his history, and his culture.' Later in the letter, Nelsen claimed the club is open to all races, but he isn't convincing anyone. Articles on the archived ProjectUSA website by Nelsen include subjects such as 'The White Minority.'" (Count II)

- "A number of Lexington's 4,000 residents are not happy at the prospect of Nelsen relocating to their town and setting up this club. One resident compared Nelsen's arrival in Lexington to that of neo-Nazi Craig Cobb, who attempted to start a whites-only colony in the tiny town of Leith, North Dakota, in 2012." (Count III)

- Stating that Nelsen is "anti-immigrant." (Count IV)

- "[Nelsen's] group made a name for itself by sponsoring racist billboards. One on display in New York City depicted a white boy and the words, 'Immigration is doubling U.S. population in my lifetime.'" (Count V)[2]

(Doc. 6 at ¶ 54).

SPLC later filed a motion to dismiss for failure to state a claim. (Doc. 24.) In ruling on SPLC's motion to dismiss, the Court found that neo-Nazi, anti-immigrant, and racist are subjective characterizations that are not objectively verifiable, and therefore dismissed Counts II-V of Nelsen's Complaint to the extent they were based on statements implying that Nelsen is a neo-Nazi, anti-immigrant, and a racist. (Doc. 45.) The Court found that the statement that a club is "whites-only" could be understood to mean that people of races other than "white" are excluded, which would be an objectively verifiable fact, and therefore, denied SPLC's motion to dismiss Counts I-V of Nelsen's Complaint to the extent the Article implies Nelsen is opening a "whites-only" or "whites-favored" Club. (*Id.*) The Court found that the Complaint alleged, since SPLC knew some people were convinced the Club was open to all races, it knew that its statement— "Nelsen claimed the club is open to all races, but he isn't convincing anyone"—was false, and this statement could conceivably state a fact that the Club is not open to all races. (*Id.*) The Court therefore concluded that the Complaint survived SPLC's motion to dismiss as to Counts I-III to the extent those counts asserted the Article's implication that Nelsen is opening a "whites-only" Club. (*Id.*) The Court found, however, that the Complaint did not contain any specific facts regarding fault as to the remaining claims, and therefore, the remaining defamation claims failed on multiple grounds, including lack of facts plausibly demonstrating fault. (*Id.*)

---

[2] The Complaint also contained a sixth count, however, Nelsen conceded the count failed (Doc. 33 at 9), and so the Court dismissed Count VI in its July 31, 2019 Order. (Doc. 45.)

## Legal Standard

"Summary judgment is required if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (quotation marks and citations omitted). In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Id.* (quotation mark and citation omitted). At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56(c)(1).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *see also Thomas v. Corwin,* 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Fed. R. Civ. P. 56(e)). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co*., 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). Additionally, unless specifically controverted by the nonmoving party, all facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment. L.R. 56.1(a). To controvert a factual position, the nonmoving party must "refer specifically to those portions of the record upon which [he] relies." *Jones v. United Parcel Service, Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (citation omitted). Finally, Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**Discussion**

## I.     Compliance with Local Rule 56.1

      As an initial matter, the Court notes that Plaintiff has not complied with Local Rule 56.1. While the Court reviews the record in the light most favorable to Plaintiff as the non-moving party, and while "pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law." *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984).

      To that end, the Court notes that "Local Rule 56.1 places size and content limitations on a non-movant's response to a summary judgment motion." *Jones*, 461 F.3d at 990. Additionally, Local Rule 56.1 sets out the manner in which a motion for summary judgment and opposing suggestions should be filed in this Court and states in part:

> (a) **Supporting Suggestions.** A party moving for summary judgment must begin its supporting suggestions with a concise statement of uncontroverted material facts. Each fact must be set forth in a separately numbered paragraph and supported in accordance with Fed. R. Civ. P. 56(c).
>
> (b) **Opposing Suggestions.**
>
>    1. A party opposing a motion for summary judgment must begin its opposing suggestions by admitting or controverting each separately numbered paragraph in the movant's statement of facts. If the opposing party controverts a given fact, it must properly support its denial in accordance with Fed. R. Civ. P. 56(c). Unless specifically controverted by the opposing party, all facts set forth in the statement of the movant are deemed admitted for the purpose of summary judgment.
>
>    2. If the opposing party relies on any facts not contained in the movant's suggestions, the party must add a concise listing of material facts. Each fact in dispute must be set forth in a separately numbered paragraph and properly supported in accordance with Fed. R. Civ. P. 56(c).
>
>    …
>
> (d) **Presentation of Factual Matter.** If a party's suggestions refer to facts contained in another document, such as a deposition, interrogatory answer, or admission, the party must attach a copy of the relevant excerpt.

Local Rule 56.1.

      To support a denial properly, the nonmoving party must cite to particular materials in the record or show that the materials the moving party cites do not establish the absence of a genuine

4

dispute. Fed. R. Civ. P. 56(c)(1). As noted above, when a party fails to properly address another party's assertion, the Court may consider the asserted fact undisputed and may grant summary judgment if the movant is entitled to it. Fed. R. Civ. P. 56(e).

These requirements help to "distill to a manageable volume the matters that must be reviewed by a court undertaking to decide whether a genuine issue of fact exists for trial." *Jones*, 461 F.3d at 990 (8th Cir. 2006). It is not the District Court's province "to sift through evidence, pondering nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.*, 24 F. 3d 918, 920 (7th Cir. 1994). Put another way, courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or a defense. *Libel v. Adventure Lands of Am., Inc.*, 482 F.2d 1028, 1032 (8th Cir. 2007).

Here, Plaintiff fails to controvert Defendant's statement of facts in a coherent manner, blends his arguments with his assertions of facts, and does not consistently cite to the record. Defendant's Motion for Summary Judgment and Suggestions in Support contains a 52-paragraph statement of uncontroverted facts ("SUMF") spanning fifteen pages. Doc. 131 at 2-16. Plaintiff therefore was required to submit a 52-paragraph response individually addressing each paragraph or risk admitting Defendant's uncontroverted facts. Plaintiff failed to comply with Local Rule 56.1 in that he did not address each of Defendant's 52 paragraphs. Plaintiff instead purports to dispute only portions of sixteen of Defendant's 52 paragraphs over a span of 29 pages. Some of these paragraphs contain citations to documents not in the record; some do not contain any citations at all. Further, many do not address the facts they purport to dispute, but rather make arguments as to why those facts may be "misleading" or lack context Plaintiff apparently felt ought to have been included. As such, Plaintiff does not specifically controvert or state why each fact is in dispute as required by Federal Rule of Civil Procedure 56(c) and referenced in Local Rule 56.1(b).

Plaintiff's broad allegations of dispute without consistent citation to the record and without following each of Defendants' numbered paragraphs are in violation of both the Federal Rules of Civil Procedure and the Court's Local Rules. As noted above, "courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or a defense." *Libel*, 482 F.2d at 1032.

Accordingly, Plaintiff has failed to set forth specific facts showing that a genuine issue of material fact exists and, pursuant to Local Rule 56.1, Defendant's statement of uncontroverted

facts is deemed admitted in full. However, in the interest of adjudicating the case on its merits, where the Court can discern Plaintiff's disagreement with Defendant's statement of undisputed material facts, the Court has taken the disputed fact into consideration and nonetheless determined that Defendant is entitled to judgment as a matter of law.

## II. Defamation

Turning to the merits of the case, Plaintiff's claims allege defamation. Under Missouri law[3], to establish a cause of action for defamation, a plaintiff must satisfy the following elements: "'1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation.'" *Cockram v. Genesco, Inc.*, 680 F.3d 1046, 1050 (8th Cir. 2012) (quoting *Missouri ex rel. BP Prods. N. Am. Inc. v. Ross*, 163 S.W.3d 922, 929 (Mo. 2005) (en banc)).

Counts I, II, and III of the Complaint remain and only as to statements in the Article implying that Nelsen is opening a "whites-only" Club, and SPLC now seeks summary judgment on the grounds that (1) Nelsen cannot establish that the challenged statement is materially false, (2) Nelsen is a limited purpose public figure and cannot show clear and convincing evidence of actual malice, and (3) Nelsen suffered no cognizable harm attributable to the challenged statement. Nelsen opposes SPLC's motion on each of the asserted grounds. The Court will not address each of the parties' arguments because, as set forth below, the Court concludes Defendant is entitled to summary judgment on Plaintiff's claims because Nelsen is a limited purpose public figure and cannot show evidence of actual malice, making it unnecessary to address the additional arguments presented.

### A. Nelsen is a limited purpose public figure and cannot show actual malice as required to survive summary judgment

In the Court's order granting in part and denying in part SPLC's motion to dismiss for failure to state a claim, it noted that the Complaint contains allegations regarding Defendant's familiarity with "the Facebook group, Lexington Bulletin Board" which included discussion pointing out that the Club was open to men of any race. (*See* Docs. 6 at ¶¶ 80, 103.) The Court also observed the Complaint's allegation that, since SPLC knew some people were convinced the Club was open to all races, it knew that its statement—"Nelsen claimed the club is open to all races, but he isn't convincing anyone"—was false. The Court found this statement could

---

[3] The parties rely on Missouri law, so the Court will do the same.

6

conceivably state a fact that the Club is not open to all races, and thus the allegation was sufficient to show SPLC had reason to know the Club might actually be open to all races. The Complaint therefore survived SPLC's motion to dismiss as to Counts I-III to the extent those counts assert the Article's implication that Nelsen is opening a "whites-only" Club.

In its motion for summary judgment, SPLC argues Nelsen is a limited purpose public figure and cannot show clear and convincing evidence of actual malice.

### 1. Limited Purpose Public Figure[4]

"A limited-purpose public figure is defined as one who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'" *Cockram v. Genesco, Inc.*, 680 F.3d 1046, 1053 (8th Cir. 2012) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Determining whether an individual voluntarily injected himself into a controversy requires an examination of the "nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 1053 (quoting Gertz, 418 U.S. at 352). The following background, including a period of years prior to SPLC's publication of the disputed statements, leads the Court to find Nelsen is a limited-purpose public figure as to a range of issues including whether his Boxing Club would be whites only.

According to Defendant's statement of uncontroverted facts, deemed admitted in full, Nelsen founded ProjectUSA in the late 1990s. Nelsen was deeply concerned by what he perceived as break-neck population growth of Asians in New York City and troubled by the "reckless policy" he believed was fueling such growth. (Complaint at ¶¶ 1, 2.) ProjectUSA placed billboards around New York City concerning immigration in the United States. As a result of this project, Nelsen and ProjectUSA were the subject of "public hysteria" on national television, by a congressional representative, and by other politicians in press conferences, and were "publicly slammed as a racist and a Nazi" in an article in the SPLC publication "Intelligence Report." (Complaint at ¶¶ 4-6.)

In intervening years, Nelsen gave "hundreds" of press interviews to reporters from all over the world on issues including race, and publicized his views in various publications and online

---

[4] Whether Nelsen is a limited purpose public figure is relevant because, if he is, actual malice is the requisite degree of fault applicable. For actual malice, Nelsen must show that SPLC published the disputed statements "with knowledge that the statements were false, or with a reckless disregard as to whether they were true or false." *Id.* at 1052 (quoting *Warner v. Kan. City Star Co.*, 726 S.W.2d 384, 385 (Mo. Ct. App. 1987)).

platforms. (SUMF ¶¶ 3-4.) In 2008 Nelsen wrote an article that was critical of immigration "because it's the loss of white majority." (Nelsen Tr. 196, 198.) Nelson equated the loss of white majority as being conquered or being subjugated. Nelsen viewed this changing population demographics as "deeply troubling and cause for alarm for white Americans." (SUMF ¶ 4.) Other publications by Nelsen include an essay exploring media culpability for a white supremacist's mass murder of nine African-Americans in a Charleston church shooting. Nelsen also created a "meme" image on Twitter juxtaposing Black Lives Matter marchers with African village violence under a "#blackslovemurder" hashtag, and he posted about "the Jews" on his social media accounts. (SUMF ¶ 4.)

In about 2015, while living in Baltimore and exploring an ultimately abandoned house-renovation venture, Nelsen noticed a "rash of panhandlers" who were "all young, white, able-bodied males" despite it being "a majority black city." (SUMF ¶ 6.) Nelsen spoke with these men and learned they were—as he had been for a decade—addicted to heroin. (Id.) Nelsen attributed this to a "crisis of suicidal self-loathing" among white men due to "cultural bigotry toward whites" and "racial denigration from the popular culture." (Id.) He developed the idea of a treatment program built around boxing, nutrition and academic study of Western civilization. Nelsen's program was "designed to address the specific challenges unique to white males in the United States." (Id.) The Boxing Club concept as envisioned by Nelsen was geared toward "high IQ men" like him. (Id.) Nelsen was able to do little to move the project forward for the next couple of years. (Id. at ¶ 7.) From about 2015 to 2017, Nelsen worked for his landlord, Pat Welch. Welch was a Washington D.C. real estate developer and Lexington, Missouri, native who faced a $14 million legal claim arising from real estate transaction agreements. (Id.) Nelsen credits himself with getting the debt released through his investigatory efforts. As a result, Nelsen believed Welch owed him compensation, and Nelsen wanted to use this money to start his Boxing Club project. (Id.)

Nelsen prepared a website for the Boxing Club concept, which laid out an "academic canon" based on Western classics. Nelsen's program concept involved rigorous weekday schedules from 6 a.m. to 11 p.m. filled with boxing, classroom learning, reading, chores, music, movies, and practical skills such as "butcher," "plumbing," and "guns." (Id. at ¶ 9.) In September 2017, following the conclusion of his work for Welch, Nelsen set his sights on Welch's hometown of Lexington, Missouri, as the location for the Boxing Club. (Id. at ¶ 11.) He sent a letter to

William Sellers, a former head of the recently closed Wentworth Military Academy in Lexington, Missouri. Nelsen expressed an interest in "acquiring the property in order to launch a new project, the Robinson Jeffers Boxing Club," to "address[] the opioid crisis gripping our nation." (*Id.*) The letter consisted of several paragraphs describing the "racial denigration" of white males as the "root cause" for the "devastation among white males" by the opioid epidemic, and the Robinson Jeffers Boxing Club as a "13-week, residency treatment program for 234 men focused on the particular needs of the high IQ white male heroin addict." (*Id.*) A footnote to the letter stated that "[w]hile the program will address the particular challenges faced by white men, we will accept males of any race with a heroin addiction and who are seeking help." (*Id.*) Nelsen included this footnote to avoid conveying an impression based on the rest of the letter that the program would be "for whites only." (*Id.*)

Receiving no response from Sellers, Nelsen settled on an empty warehouse in Lexington owned by Welch as the location for the Boxing Club. (*Id.* at ¶¶12-13.) Nelsen intended to renovate Welch's warehouse in Lexington and launch the Boxing Club through support from online crowdsourcing or financial investors. (*Id.* at ¶ 16.) While on the way to Missouri, Welch texted Nelsen that instead of the warehouse he would let Nelsen use a vacant store in town that he owned. (Id. at ¶ 17.) Nelsen arrived in Lexington on December 27, 2017. (*Id.* at ¶ 18.) The storefront had been vacant at least a year, and lacked electricity, water, or heat. The storefront needed significant cleaning and renovation to be turned into either a boxing club or a residential treatment facility. (*Id.*) Nelsen started cleaning and spreading the word about his efforts. (*Id.*)

Nelsen's Boxing Club website remained anonymous for several days into the New Year, with just three website visitors on January 1; 10 visits on January 2; one visit on January 3; and four visits on January 4, of 2018. (*Id.* at ¶ 19.) That number skyrocketed to 1,270 visits on January 5. Nelsen attributes this sudden increase as a result of the intense public discussion in online community bulletin boards in Lexington, over Nelsen's plans for his project (*Id.*) In the following weeks, Nelsen's website would attract more than 1,000 visitors on any single day. (*Id.*) By this point, Nelsen was reaching "a fairly significant number of people" in the Lexington community. (*Id.*) The public attention quickly turned critical, however. (*Id.* at ¶ 20.) On January 8, 2018, Nelsen reported to Welch that "[t]here is a woman who spent all day yesterday digging up my history and posting it on a well-read Lexington Facebook page." (*Id.*) This included prior online reports by SPLC and others about his work with ProjectUSA and other aspects of Nelsen's online

history and publications, including his Boxing Club website. (*Id.*) The woman Nelsen complained to Welch about urged that the city should deny Nelsen a business license, citing Nelsen's online record, "because [he] would be a recruiter for white nationalism." (*Id.*) Sellers then posted to the Lexington Facebook page quoted language from the letter Nelsen sent him that explained the program's focus on the "high IQ white male heroin addict." Sellers post, however, did not quote the footnote that the program would accept males of any race. (*Id.*; Plaintiff's Response at pages 20-21.)

A clerk at the motel where Nelsen was staying told him on January 8 that Nelsen's plan to open the Boxing Club was "the talk of the town." (*Id.* at ¶ 21.) The discussion in the community was such that the then-City Administrator (and now Mayor), Joe Aull, called Nelsen on January 8 to discuss the project. (*Id.*) Recognizing a tide of public opinion turning against him, Nelsen advocated his view of the project and his bona fides, through the website, by seeking press coverage, and by reaching out personally. (*Id.* at ¶ 22.) On the website, he penned a series of "open letters" responding to criticisms. (*Id.*) He gave an interview to the news editor of a local newspaper, the Lexington News. (*Id.*) The Boxing Club controversy filled the next edition's front page. (*Id.*) One story, on the top right of the front page, described Nelsen's plans based on the interview under the headline "Washington, D.C. man plans to open drug rehab program in Lexington." (*Id.*) Another story, on the top left of the front page, was titled "Residents express concern about proposed facility." This story summarized criticisms, including concerns "around the fact that the program is geared toward white males." (*Id.*) Nelsen also gave an interview on January 10 to a reporter for the Richmond Times. (*Id.* at ¶ 23.) During this period, Nelsen also lobbied town councilmembers about the Boxing Club. (Id. at ¶ 24.) As Nelsen put it in his testimony, he was "[t]alking about the big controversy. It really was the talk of the town." (*Id.*)

Nelsen attended a meeting of the Lexington Planning and Zoning Commission on January 16, 2018, which was the first step toward securing approvals for the project. (Id. at ¶ 26.) After word spread that the Boxing Club concept was on the agenda, the Commission moved the meeting from a regular city meeting room to the city auditorium because of the expected crowd. (*Id.*) Two Kansas City television stations sent news crews, and approximately 250 to 300 people attended in person. (*Id.*) "Old-timers" in the community told Nelsen they had never seen the auditorium so full, even to the balconies. (*Id.*) One resident live-streamed the meeting on Facebook to those who were unable to attend in person. (*Id.*) Nelsen viewed the meeting as a "make or break

moment" for his project.  (Id. at ⁋ 27.)  Police outside offered to provide him security walking in.  (*Id.*)  Nearly all—or, by Nelsen's recollection, all—of the public comments by 15 to 20 citizens were against him.  (*Id.*)  When asked his qualifications to open a treatment facility in their town, Nelsen told the crowd that he was a six-time heroin user himself.  (*Id.*)  According to the City Administrator, "[i]nquiries about the program made it clear to those in the room that Mr. Nelsen had only a vague idea as to how he would supervise his clientele and what kind of educational activities he would be providing them."  (*Id.*)

The official Commission minutes reflect that Nelsen told the crowd that he had no other similar facilities, no licenses, no qualified medical staff, and no security.  (*Id.*)   As the Commission's co-chairman testified: "The hearing on Mr. Nelsen's proposal became quite vociferous with audience members aggressively asking questions of Mr. Nelsen and making comments directly to him. Some of the comments coming from audience members involved name calling."  (*Id.*)  Nelsen equated the long meeting to a "15-minute hate," referencing screaming sessions in George Orwell's dystopian novel, 1984, and hoped that the public mood might pass.  (*Id.*)  By the end of the Commission meeting, Nelsen said he would withdraw his proposal and suggested that he would drop the plan and maybe open a fitness center instead.  (*Id.* at ⁋ 28.)

The two Kansas City television news stations, who had interviewed Nelsen in advance of the meeting and covered it, broadcast stories.  (*Id.* at ⁋ 29.)  One of the journalists had, like community members, searched Nelsen's online history.  The journalist included a significant amount of it in the resulting news story about the Commission meeting, under the headline "Lexington residents appalled at man's plan for unlicensed drug addiction center."  (*Id.*)  The controversy again led the front page of the next Lexington News edition, under the headline "Huge crowd turns out to oppose planned drug center."  (*Id.* at ⁋ 30.)  On January 23, 2018, the City Administrator visited Nelsen at the storefront, which he was still in the process of cleaning, and served him with a stop-work order.  (*Id.* at ⁋ 31.)  Nelsen says the official told him, "Craig, just as a friend, you know, I have to tell you, you just have to go. It's not going to work."  (*Id.*)  Welch texted Nelsen that same day to explain that "[p]eople are gunning for you."  Nelsen understood this to mean even the people he called the "good whites" of Lexington remained highly critical of his plans in order to appear anti-racist.  (*Id.* at ⁋ 32.)

Pursuant to a careful examination of the nature and extent of Nelsen's participation in the controversy giving rise to the defamation, as detailed at length above, the Court determines Nelsen

11

voluntarily and repeatedly injected himself into the controversy. Accordingly, the Court finds Nelsen became a public figure for a limited range of issues including whether his Boxing Club would be whites only. *Cockram*, 680 F.3d at 1053; *Gertz*, 418 U.S. at 351-52.

### 2. Actual Malice

Having determined as a matter of law that Nelsen is a limited purpose public figure on the issue of whether his Boxing Club would be whites only, the Court must next determine whether SPLC has supported its motion by showing there is an absence of evidence to support the requisite level of fault. *Celotex Corp.*, 477 U.S. at 325. The Court must decide whether SPLC has shown that Nelsen failed to set forth specific facts, by affidavit or other evidence in the record, showing that a genuine issue of material fact exists as to whether SPLC published the disputed statements with actual malice. Actual malice is "knowledge that the statements were false, or with a reckless disregard as to whether they were true or false." *Cockram*, 680 F.3d at 1052 (quoting *Warner*, 726 S.W.2d at 385).

In mid-January of 2018, SPLC was contacted by at least three separate people with ties to Lexington, Missouri, about the ongoing controversy of the Boxing Club. (SUMF at ⁋⁋ 33-36). The tips were forwarded to Stephen Piggott, who wrote for the SPLC blog Hatewatch about various forms of right-wing extremism, including the organized anti-immigrant and anti-Muslim movements, as well as white nationalism. (*Id.* at ⁋ 37.) Piggott was aware of Nelsen's work with ProjectUSA. In preparation of writing an article, Piggott reviewed and relied on previous SPLC reporting about the organization, which advocated for reduced U.S. immigration because "there is a very strong possibility that present policy will lead to a balkanized America of hostile and competing ethnic groups." (*Id.* at ⁋ 38.) Piggott investigated the submitted tips by reviewing the information and links and by searching online for Robinson Jeffers Boxing Club and Craig Nelsen and reviewing Nelsen's website. (*Id.* at ⁋ 39.) He saw others express skepticism towards Nelsen's plan "to start a white pride boxing and poetry club for (white) drug addicts in Lexington." (*Id.*) Piggott also reviewed news reports about the controversy, including "Lexington residents appalled at man's plan for unlicensed drug addiction center." Piggott reviewed Sellers post regarding Nelsen's letter that cited "racial denigration" of white males as the root cause of addiction and the program concept as focused on "the high IQ white male heroin addict." (*Id.*)

SPLC published Piggott's article on January 24, 2018. (*Id.* at ⁋ 40.) The article included the sentence presently at issue: "Nelsen claimed the club is open to all races, but he isn't convincing

anyone." (*Id.* at ¶ 42.) Piggott wrote the article to provide an update about Nelsen and to provide greater context about him. Piggott included the subject statement based on Nelsen's background on race issues; Nelsen's repeated representations that the Club would cater to white males; Nelsen's solicitation for "white men in distress" for the program; and the online and widely reported statements by Lexington residents about their concern with Nelsen's history and focus on race. (*Id.* at ¶¶ 40, 42.) Piggott believed the statement to be true. (*Id.* at ¶ 42.)

Here, Nelsen fails to set forth specific facts, by affidavit and other evidence, showing that a genuine issue of material fact exists as to SPLC's level of fault in making the statement implying Nelsen's Boxing Club was whites only. Fed. R. Civ. P. 56(c); *see also Thomas,* 483 F.3d at 527 (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). Nelsen's claim of SPLC publishing the statement with actual malice is couched in terms of: (1) Piggott's purpose in writing the article was "to do as much damage to my reputation by painting me as a Nazi even though knowing full well I am not a Nazi" (Plaintiff's Response at page 27.) (2) "the order from Heidi Beirich . . . to Stephen Piggott to '[g]o get him'" (*Id.*) (3) "It was an obvious hit job" (*Id.* at 30.) (4) "straight white males definitely have a target on their backs for Stephen Piggott" (*Id.*) (5) In Piggott's deposition, "he identified white males as the source of all racial injustice in US history and gave testimony that he believes every racial, ethnic, etc., group in America faces special challenges *except white males.*" (*Id.*) (6) Piggott "has it out for straight white males" (*Id.*) (7) Piggott's response to a deposition question "Why did you choose [the comment that compared me to a neo-Nazi]?" was "I don't recall why I chose it specifically."[5] (*Id.* at 27.) None of this material, however, sets forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists as to Stephen Piggott or SPLC publishing the statement at issue with knowledge that it was false, or with a reckless disregard as to whether it was true or false.

Regardless of any alleged bias of Stephen Piggott against white males or even against Nelsen himself, "[e]vidence of a defendant's ill will, desire to injure, or political or profit motive does not suffice" for Nelsen to "prove by clear and convincing evidence that the defendant . . . made false remarks with a high degree of awareness of probable falsity, or that the defendant entertained serious doubts as to the truth of his publication." *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 569 (8th Cir. 2001); *Garrison v. Louisiana*, 379 U.S. 64, 78-79, 85 S.Ct.

---

[5] The documents cited for these allegations are not in the record.

209, 13 L.Ed.2d 125 (1964); *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

**Conclusion**

Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Defendant's statement of uncontroverted facts is deemed admitted in full. However, in the interest of adjudicating the case on its merits, where the Court can discern Plaintiff's disagreement with Defendant's statement of undisputed material facts, the Court has taken the disputed fact into consideration and nonetheless determined that Defendant is entitled to judgment as a matter of law. SPLC has shown that Nelsen is a limited purpose public figure and cannot show clear and convincing evidence of actual malice. Accordingly, and after careful consideration, the motion for summary judgment (Doc. 130) is **GRANTED.** The Court finds Plaintiff's motion for leave to file a sur-reply (Doc. 140) **MOOT.**

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: January 19, 2021